# CHARLESTON.

THEODORE NEEKAMP *et al* v. HUNTINGTON CHAMBER
OF COMMERCE *et al.*

(C. C. 355)

Submitted September 2, 1925.   Decided September 8, 1925.

1.   COVENANTS—*Covenant Not to Erect any Building Other Than For Dwelling Purposes and Necessary Outbuildings Therefore Need Not to Prevent Construction of Spur Railroad Track.*

Deeds, conveying lots, in Tudell Addition to Westmoreland, West Virginia, contained the following stipulation: "That there shall not be erected on the said premises any building other than for dwelling or residence purposes, or purposes of like nature, and the necessary proper outbuildings pertaining thereto; nor shall any building erected thereon be used for other than dwelling or residence purposes or purposes of like nature, and as such outbuildings pertaining thereto. The covenants herein contained shall run with the land and the provisions herein shall extend to the heirs and successors and assigns of the parties hereto."

The erection and operation by an incorporated railroad company of a spur-track leading from the main line of such railroad, operated by said railroad company, across some of said lots, will not constitute a violation of said restrictive covenant.   (p. 394.)

(Deeds, 18 C. J. § 450.)

2.   SAME—*Restrictive Covenants to be Strictly Construed Against Person Seeking to Enforce Them.*

Restrictive covenants are to be strictly construed against the person seeking to enforce them, and all doubts must be resolved in favor of natural rights and a free use of property, and against restrictions.   (p. 396.)

(Building, 9 C. J. p. 685.)

(NOTE:   Parenthetical references by Editors, C. J.—Cyc.   Not part of syllabi.)

Case Certified from Circuit Court, Wayne County.

Suit by Theodore Neekamp and others against the Huntington Chamber of Commerce and others.   After sustaining

a demurrer to plaintiff's bill of complaint, the court certified questions.

*Affirmed.*

*Jean F. Smith,* for plaintiffs.

*Livezey & McNeer,* for defendant Chamber of Commerce.

*Vinson, Thompson, Meek & Renshaw,* and *Harry Scherr,* for defendant Baltimore & Ohio Railroad Co.

Woods, Judge:

This is a suit in chancery, the sole object of which is to deny the defendants the right to use certain lots in the Tudell Addition, Westmoreland, in the City of Huntington, for the purpose of constructing and operating thereon a railroad side-track or spur-track. The lots referred to are owned by the defendant, Huntington Chamber of Commerce, which proposes to convey them to the defendant, The Baltimore and Ohio Railroad Company, in consideration of which the railroad company has agreed to construct and operate thereon the spur-track referred to in order that transportation facilities may be afforded certain industrial plants situate in the Tudell Addition. The bill of complaint is framed as one for purely injunctive relief—for a temporary injunction, to be made perpetual upon final hearing, inhibiting the railroad company from building its spur-track to serve the industrial shippers mentioned. The theory of plaintiffs is that the use of said lots for industrial spur-track or side-track purposes will be violative of a restrictive covenant running with the land to the effect that the land shall be used for residence purposes only, and that irreparable injury to the plaintiffs would result from such use, the bill alleging ownership by plaintiffs of other lots in said Tudell Addition having thereon their residence building.

The bill of complaint sets up the following facts:  By deed of April 3, 1912, Blair P. Wilson Company, a corporation, acquired title to a parcel of land containing 83.43 acres, situate at and near the boundary line of the counties of Wayne and Cabell—partly in the one and partly in the other; whereupon it caused the same to be platted into lots, streets and alleys, designated "Revised Map of Tudell Addition,

West Moreland, West Virginia," and duly recorded the plat
in the office of the clerk of the county court of Wayne
county. The lots shown on the plat were put on the market
and offered for sale to the public; and from time to time
thereafter sales were made by the Blair P. Wilson Company,
by reference to the plat, until about the year 1919. These
sales were carried into execution by apt and proper deeds
delivered to the purchasers, respectively, and every such deed
contained a covenant by the grantee, with respect to any
improvements to be placed on the land, in the following lan-
guage:

> "That no building nor any part thereof shall be
> erected or maintained upon the premises herein
> conveyed nearer than twenty (20) feet to the front
> property line of said lot; nor shall the dwelling
> erected on said premises cost less than Fifteen
> Hundred Dollars ($1,500.00) when completed.
>
> "That there shall not be erected on said prem-
> ises any buildings other than for dwelling or resi-
> dence purposes, or purposes of like nature, and the
> necessary and proper out-buildings pertaining
> thereto; nor shall any building erected thereon be
> used for other than dwelling or residence purposes
> or purposes of like nature, and as such out-build-
> ings pertaining thereto.
>
> "The covenants herein contained shall run with
> the land and the provisions herein shall extend to
> the heirs and successors and assigns of the parties
> hereto."

The land which embraces the Tudell Addition lies be-
tween the main line of the Baltimore and Ohio Railroad Com-
pany, on the north, and the main line of the Chesapeake and
Ohio Railway Company, on the south. All of the land thus
situated, however, was not acquired by the Blair P. Wilson
Company and was not included in, and did not become a
part of, the Tudell Addition. Prior to the platting of the
addition, the National Interior Finish Company, a then man-
ufacturing corporation, had acquired a parcel of ground
just north of the Chesapeake and Ohio Railway Company's
main line, and contiguous to the land embraced in said ad-

dition, immediately adjacent to Block No. 5 therein. This parcel was never burdened with any building restrictions, was in the possession of National Interior Finish Company, owner thereof, and, it may be assumed, that it was being used, or would be used, for manufacturing purposes was generally recognized or known.

Early in the year of 1919, the Blair P. Wilson Company, still the owner of all the unsold lots, broke down and failed and its affairs were wound up in a suit which was brought in the circuit court of Cabell county. Under decrees of the court, all the lots remaining unsold were disposed of to sundry purchasers by the special receiver who, pursuant to authority, conveyed the same by deeds without any provisions or covenants whatsoever with respect to building restrictions. Among the lots so sold by the receiver, Lots Nos. 1 to 19, Block No. 5 (lying next to the parcel owned by National Interior Finish Company, and which had been acquired by Ohio Valley Mine Car and Manufacturing Company) were purchased by one Bosley who conveyed them to the said mine car company; and all the lots in Block No. 7 were purchased by Bosley and others who then conveyed them to the mine car company. This was during the year 1919. Immediately the mine car company constructed a large plant upon its three parcels—the parcel formerly owned by the National Interior Finish Company, Lots 1 to 19, Block 5, and all the lots in Block No. 7—and since then, by itself or its successors, has operated the plant in the manufacture of mine cars and similar products. Also, in the year 1919, the receiver sold and conveyed all of the lots in Blocks Nos. 9 to 18, inclusive, including the streets and alleys, to one Somers, who thereupon conveyed the same to West Virginia Glass Manufacturing Company. This concern erected upon the premises a glass manufacturing plant which has been operated continuously since.

As stated, all of the lots in Tudell Addition not theretofore sold by the Blair P. Wilson Company, were sold and conveyed by the receiver in the suit referred to; and all of the lots so sold by him, his vendees and their successors in title,.

were sold and conveyed free of building or other restrictions.

Plaintiffs set up their title to Lots Nos. 19 and 20, Block No. 1, Tudell Addition, and allege that they have improved the same by erecting a residence building thereon at an approximate cost of eight thousand dollars, their total investment being upwards of ten thousand dollars. Lot No. 19 was conveyed by one C. W. Cammack to the male plaintiff by deed of September 26, 1921. This deed does not contain the restrictive covenants above set forth; but the deed for this lot from Blair P. Wilson Company to Cammack's remote grantor carries the restrictive covenants. Lot No. 20 was conveyed to the female plaintiff by one Lucas by deed April 23, 1920, Lucas having acquired the same by *mesne* conveyances from the Blair P. Wilson Company. The deed from the Wilson Company to Lucas' remote grantor likewise carries the said restrictive covenants.

The defendant, Huntington Chamber of Commerce, is a corporation whose objects and purposes are to promote and develop the business and industrial life of the City of Huntington. It was instrumental in inducing the West Virginia Glass Manufacturing Company to establish its glass plant on the lots and streets in Tudell Addition (all the lots in Blocks Nos. 9 and 18, and streets and alleys therein) which were conveyed by the special receiver to David Somers and by the latter to the glass company. This was in 1919—prior to the time the plaintiffs acquired their lots; and the Chamber of Commerce promised the glass company that it would do what it could to assist it in having an industrial side-track or switch-track extended from the main line of the Baltimore and Ohio Railroad to the plant of the glass company. Thus adequate transportation facilities were to be offered the glass company—a side-track from the Baltimore and Ohio Railroad main tracks, on the north, as well as the then side-track extending from the main line of the Chesapeake and Ohio Railway Company, on the south, the glass plant lots being situate in the Tudell Addition between the main lines of the two railroads. In accordance with this understanding, the Chamber of Commerce acquired by purchase, lots, or portions thereof, in

Blocks Nos. 1, 2, 3, and 8, in the Tudell Addition and is ready to convey them to its co-defendant, Baltimore and Ohio Railroad Company, in consideration whereof the railroad company has agreed to construct the side-track specified, over and across the same, it having obtained the consent of the City of Huntington to use such of the streets, contiguous to the lots through which the side-track will extend, in Tudell Addition, as may be necessary in the premises.

The bill does not allege, therefore it does not appear, whether the lots, so acquired by the Chamber of Commerce and over which the side-track is proposed to be constructed, are burdened by said restrictive covenants. The bill, however, does show that some of them came from the receiver, who sold all lots without restrictions.

After alleging that the Tudell Addition was laid out as a residential district, and that the restrictive covenants were designed and inserted in the early deeds for that purpose, plaintiffs charge that the installation and operation of the side-track will destroy the value of their property, and all other property in the Addition, for residential purposes, and that the same will be violative of said covenants which they are entitled to have enforced by injunction.

A demurrer was interposed to this bill, was sustained, and on request of counsel, both for the plaintiffs and defendants, the chancellor certified the following questions to this court:

(1) Whether or not the building restrictions contained in the deeds under which the plaintiffs claim title to the lots owned by them and described in their bill preclude the owners of other lots in the same town site held under deeds, some of which contain similar restrictions from constructing a railroad thereon and using the same for railroad purposes.

(2) Whether or not the fact that there were already trunk line railroads along the north and south sides of said town site at the time it was laid out, and which are now being operated and maintained, and the fact that considerable portions of said town site have, since the same was laid out and the plaintiffs' lots sold, been sold without such building restrictions being put in the deeds of conveyance, and large factories constructed and being operated upon such portions,

which factories must necessarily have railroad shipping facilities, estop the plaintiffs from complaining of the constructing of a railroad and said factories as the bill charges the defendants are about to do.

(3) Whether or not the action of the plaintiffs in failing to urge said restrictions until after the defendant, Huntington Chamber of Commerce, had expended a large sum of money for the proposed railroad, does not estop them from now urging said restrictions against the construction of such proposed railroad.

(4) Whether or not the conveying of large portions of said town site without building restrictions and the construction of large factories thereon, which have been operated since their construction without objection by the lot owners, have not so changed the scheme and usefulness of all said town site as would make the enforcement of the building restriction in said deeds under which plaintiffs claim title, contrary to public policy.

Let us consider the first question raised on certificate. This question is supplemented and enlarged in scope by the first point made by counsel for the defendants in their brief that under a proper construction of the language of the restrictive covenant, the construction of a railroad switch track of the character described in the bill of complaint will not constitute a violation of such covenant. Is the proposed railroad spurtrack embraced in the restrictive covenant? "Restrictive covenants in conveyances of real estate * * * are not favored and will not be aided or extended by implication." *Stevenson* v. *Spivey*, 132 Va. 115. "It is always to be borne in mind that a restriction is in derogation of the common law right to use land for all lawful purposes which go with the title and possession, and that the restriction is not to be extended by implication, and all doubts are generally to be resolved against its extension. The restrictions cannot be enlarged by implication or extended by construction beyond their original intent in order that the general purpose of the parties may be effectuated under new conditions not to be anticipated." 27 R. C. L. 507. The rule is tersely stated by this Court in former decisions: Restrictive covenants are to

be strictly construed against the person seeking to enforce them, and all doubt must be resolved in favor of natural rights and a free use of property, and against restrictions. *Cole* v. *Seamonds*, 87 W. Va. 19; *Deutsch* v. *Mortgage Securities Company*, 96 W. Va. 676. Tested by these principles, would the covenant in this case prohibit the building of the proposed railroad track? The covenant prohibits the erection of any "building" other than for dwelling or residential purposes. It is then necessary to determine what is meant by the word "building." The parties are presumed to have used the words in the deed in the sense in which they are generally understood. *Mills* v. *Edgell*, 69 W. Va. 421. This word has on several occasions received a judicial construction. In *Truesell* v. *Gay*, 13 Gray 311, Biglow, Judge, said: "The word 'building' cannot be held to include every species of erection on land, such as fences, gates, or other like structures. Taken in its broadest sense, it can mean only an erection intended for use and occupation as a habitation or for some purpose of trade, manufacture, ornament, or use, constituting a fabric or edifice, such as a house, a store, a church, a shed." Possibly one of the clearest definitions of the word in question is given by the Supreme Court of the State of New York: "The word 'building' is derived from the Anglo Saxon 'bold,' meaning a dwelling. A building is defined to be 'a structure in the nature of a house built where it is to stand;' * * * * 'as commonly understood, a house for residence, business or public use, or for shelter of animals or storage of goods;' * * * and very generally, though not always, the idea of a habitation for the permanent use of man, an erection connected with his permanent use, is implied in the word 'building'." *Rouse* v. *Catskill Steamboat Co.*, 59 Hun. 80, 13 N. Y. S. 126. We find no reported case in any jurisdiction where the term "building" was held to include a "railroad" track. It is true, the word "structure" has been held to include a "railroad" in a few instances. This was, however, in cases where a rule of liberal construction was proper. But it is significant that the word "structure" is not employed in the covenant under consideration. That the restriction is confined to "buildings" in the ordinary use of the word, is clearly

seen when the use of them is limited by the language of the covenant to "dwelling and residence purposes". "Where a particular enumeration is followed by descriptive words, the matter will be understood as limiting their scope to matters and to things of the same general kind or character as those specified in the particular enumeration, unless there is something to show a contrary intent." 18 C. J. 389. Applying the rule of strict construction, and using the foregoing definitions approved by the courts of all jurisdictions in this country, in construing the words of the restrictive covenants, we are led irresistably to the conclusion, that the construction of the railroad spur-track of the character described in the bill of complaint, will not constitute a violation of such covenant. This interpretation receives convincing support from the fact that the parties made the contract under consideration, in the light of the law of our state, that a public service corporation, exercising the right of eminent domain, has the advantage over a private person or corporation, in that it cannot be kept off the premises entirely, but may enter the restricted district and destroy its exclusive character upon making just compensation for the property rights thus taken.

The conclusion we have reached is decisive of the case. All other questions raised by the certificate are based on the construction given the language of the covenant by the plaintiffs. This makes a consideration of them unnecessary. It follows that the ruling of the circuit court must be affirmed.

*Affirmed.*