GEORGE S. WALLACE, *et al.*

*v.*

JAMES W. ST. CLAIR, *et al.*

(No. 12165)

Submitted September 19, 1962.    Decided October 30, 1962.

378

*Walter M. Parker, George S. Wallace, Jr., George S. Wallace, Sr.,* for appellants.

*Edmund G. Marshall, Sam R. Harshbarger,* for appellees.

CALHOUN, PRESIDENT:

This case involves an action instituted in the Circuit Court of Cabell County by George S. Wallace, Charles M. Gohen, Margaret Magner Amsbary, Lauren B. Amsbary, Samuel

Biern, Jr. and Ann A. Biern, who are referred to herein as plaintiffs, against James W. St. Clair and Doris A. St. Clair, husband and wife, who are referred to herein as defendants.

The purpose of the action is to enforce by injunction a restrictive covenant which is a part of the deed by which the defendants obtained title jointly to a lot and the dwelling situated thereon, fronting on Fifth Avenue, being on the northeast corner of Fifteenth Street and Fifth Avenue, in the City of Huntington.

Upon the trial before the court in lieu of a jury, the trial court adjudged: "that the housing of eight unrelated female students with the family of the defendants is in violation of the single dwelling restrictions but that the plaintiffs are estopped from complaining for *failure to object prior to the purchase* of the property by the defendants." (Italics supplied.)

On appeal to this Court, the appellants assert that the trial court erred in holding that the plaintiffs were precluded by estoppel from obtaining the injunctive relief sough by them. The defendants, on the other hand, contend that they have not violated the restrictive covenant; that, in any event, the trial court correctly held that the plaintiffs are precluded by estoppel from obtaining the relief which they seek; that the covenant is unenforceable because the original grantor failed to make the restriction applicable to all the lots in the two-block area affected by the restriction; and that the restriction is unenforceable because the property owners in the two-block area have for several years permitted or acquiesced in various violations of the covenant on properties other than that owned by the parties to this action.

The appeal to this Court is prosecuted only by George S. Wallace, Samuel Biern, Jr. and Ann A. Biern. Witnesses for the plaintiffs were Samuel Biern, Jr., Lauren B. Amsbary and George S. Wallace. It appears from the record that Ann A. Biern, one of the plaintiffs, was absent from the state on the day of the trial and had at that time been

absent from the state for approximately three weeks. It was suggested on the record that Charles M. Gohen, one of the plaintiffs, was prevented by ill health from appearing as a witness in behalf of the plaintiffs.

The two defendants were witnesses in their own behalf. The only additional witness for the defendants was Marjorie Ann Holley who testified in relation to the nature of the use made of the defendants' home by herself and the other roomers.

It was stipulated by the parties in the trial court that the defendants obtained the deed for their property on August 23, 1960, and that the deed is subject to a restrictive covenant which appeared in an earlier deed in the defendants' chain of title as follows:

> "That there shall be no more than one dwelling and that a single dwelling erected on each 60 feet frontage of the said premises, and such dwelling shall front on Fifth Avenue.

> "That there shall not be erected on said premises any building other than for dwelling or residence purposes or purposes of like nature, and the necessary and proper out-buildings pertaining thereto, nor shall any building erected thereon be used for other than dwelling or residence purposes, or purposes of like nature and as such out-buildings pertaining thereto.

> "That there shall not be erected on said premises or permitted in any building to be erected thereon any livery, or sales stables, slaughter house, meat or fish market, cattle, sheep or swine yard, smith or tin shop, forge, furnace, steam engine, or any manufactory of nails or other commodities of iron, brass or other metals excepting precious metals, or any oil refinery or manufactory of gun powder or or other combustible materials, glue, varnish, vitrol, ink or turpentine or for tanning, dressing or preparing skins, hides, or leather or any brewery, distillery or wholesale or retail liquor business, circus or exhibition of wild animals, cemetery or burying ground, or any pursuit, trade, business or occupation known in the law as a nuisance, or that may be properly regarded as such.

"And the said parties of the first part for themselves, their successors and assigns hereby covenant and agree to and with the said party of the second part as follows: That all the lots on both sides of Fifth Avenue in the two blocks between Fourteenth and Sixteenth Streets, sold or to be sold, shall be sold subject to the same covenants as herein contained. That all the covenants herein contained shall run with the land, and that the purchasers of every one of said lots, including the grantee herein, whether purchasing before or after this conveyance, their grantees and assigns, shall be entitled to enforce as against each and every of the purchasers of the others of said lots, including this grantee, their grantees and assigns and all subsequent grantees and assigns, the covenants herein contained."

The defendants took possession of the property shortly after August 6, the date of the purchase agreement, and moved into the dwelling on or about August 18, 1960. It was further stipulated that about the middle of September, 1960, after the opening of the fall semester at Marshall College (now Marshall University), "the defendants accepted female students as roomers in the premises, renting four of the extra bedrooms not occupied by the family to eight female students, making two students to each bedroom for which the defendants were paid compensation."

James W. St. Clair and Doris A. St. Clair, defendants, testified that on Sunday, July 30, 1960, they went together to see Dr. Samuel Biern, Jr., one of the plaintiffs, and Ann A. Biern, his wife, at their home and explained to them that they, the defendants, contemplated purchasing the home in question but that they were financially unable to purchase and pay for it unless they kept some college girls in the home as roomers for compensation. Mr. St. Clair testified that Dr. and Mrs. Biern replied as follows: "And they said that they thought that would be a good idea, and that they wouldn't object, * * * and they thought it would be all right for us to do that." Mrs. St. Clair testified that Dr. and Mrs. Biern "said it would be all right." In relation to the number of female student roomers she and her husband proposed to have in the home, Mrs. St. Clair stated: "Now,

this matter of a *few* and *two*, the words sound very similar and it could be a misunderstanding. But when I left their home, truthfully I felt that it was all right with them." (Italics supplied.)

Mr. and Mrs. St. Clair testified that they had previously talked with Charles M. Gohen, owner of a dwelling in the restricted area. Mr. St. Clair testified that Gohen "had no objection to us having some college girls in our home." Mrs. St. Clair stated that she and her husband told Gohen that they "would like to keep some college girls" and that "he said it would be fine with him."

At the time the defendants were negotiating for the purchase of the dwelling property, there was pending in the Circuit Court of Cabell County a suit by some of the plaintiffs in the instant action to enjoin the use of a dwelling in the restricted area as a college sorority house. That suit was subsequently prosecuted by the plaintiffs to a successful conclusion.

The defendants testified that after having talked with Gohen and with Dr. and Mrs. Biern, they proceeded on the same day to the home of Colonel George S. Wallace, an attorney who is one of the plaintiffs, in order to discuss the matter with him. In relation to the conversation with Wallace, James W. St. Clair testified: "And we asked him how he felt about the matter. And he stated also that * * * he was one of the plaintiffs against the sorority house. And that they had created a lot of confusion and noise over there, parking and things. We asked him about our particular situation, about us just keeping the girls as part of our home. He said he didn't know about whether he would agree to it or not, he wasn't sure. He said he would like to talk to Mr. Gohen about the matter. I stated that * * * he needn't talk to Mr. Gohen because I had just come from Mr. Gohen's house and that Mr. Gohen was in perfect agreement with what we had said and he was agreeable to us keeping the college girls and that there wasn't any use for him to talk with Mr. Gohen. At that the matter kind of dropped. I know Mr. Wallace is a very outspoken man and that he normally speaks his mind, and I felt at that time

if he had any objection he certainly would object and say flatly 'no'. He did not say that." Subsequently the witness testified: "But all these people had agreed but Colonel Wallace who didn't object prior to us making the offer." Still later the witness stated: "And I told you I asked them could I keep college girls, and they all agreed except Mr. Wallace who said he didn't know." Doris A. St. Clair's testimony was substantially to the same effect. She stated that Colonel Wallace "did not object" and "if he had any objection I felt that he would have stated it." On cross-examination the following question was propounded either by Colonel Wallace or his son, both of whom are attorneys, and James W. St. Clair gave the following answer: "Q. Isn't it true, Mr. St. Clair, that I approached you personally before the institution of this suit and before any of the girls moved in that house to see if we could stop that? A. Mr. Wallace, you personally approached me after I had agreed with the First Huntington National Bank to purchase the property. You also did not approach me with a definite statement that 'We will throw you out,' or 'We will enjoin you,' you merely said * * * 'Jim, * * *. Your father was a party plaintiff in the suit against the sorority house. And this will look bad on you if we were to have to sue you.' "

James W. St. Clair testified that he did not go to see either Margaret Magner Amsbary or Lauren B. Amsbary in person but that he called Mr. Amsbary by telephone later on the same day and that Mr. Amsbary "replied that he did not object and that for us to just go ahead and do what we were doing * * *."

The defendants apparently concede that in discussing the matter with various homeowners as stated above they did not specify any exact number of students they intended to keep as roomers in their home. Mr. St. Clair stated: "We weren't sure how many we could get."

James W. St. Clair is a practicing attorney. He testified that he was cognizant of the restrictive covenant at the time he and his wife bought the property; that he did not request any person "to waive the restrictions," or to put any consent, agreement or waiver in writing; and he testified

that he recognized that his "agreement" with the plaintiffs would have no binding effect upon other owners of property in the restricted area. His testimony tends to disclose his own legal opinion that the restrictive covenant would not inhibit the keeping of roomers as contemplated. In that connection he testified: "Sir, I did not ask these people to agree to waive the covenants specifically. I only asked them for their word whether they would object to our keeping girls. Because to this day I firmly believe, and I have searched the law on this, that there is some question as to what these covenants restrict. There has been a question, and many people feel that those restrictions do not cover this kind of conduct." Mr. St. Clair admitted that all the homes other than his own in the 1500 block where he and the plaintiffs live are used solely for residential purposes but that he felt that "what is a residence or dwelling and everything is a matter of law." He testified further as follows: "Well, I said, after we bought the house and moved in, * * * Mrs. Biern came over and she raised the question about what effect that would have, our girls, on the question of whether this was a violation or not. And I said the court could determine that. I didn't feel like we were violating the restrictions. * * *"

Dr. Biern testified that he bought his home for $37,500 in reliance on the validity of the restrictive covenant. He testified: "We were delighted to have a young couple moving in next door. And he said that he intended to have two college girls come to room there. And he was most specific. He said two. We told him that we doubted if they would bother us, but as he understood and knew, * * * we were parties to the suit against the sorority across the street for violating the restrictions, and that we certainly could not consent to any violations which might compromise our suit against the sorority. Nothing more was said at that time. At a later date—not very much later— I heard through entirely different sources that he was planning to have not two but eight college girls. * * * My wife very promptly went over and talked to Mrs. St. Clair * * *. And later on Mr. and Mrs. St. Clair came over, and in our living room we discussed this thing quite frankly and in a most friendly

fashion, and we told them if they went ahead with their plans to put eight college girls in there we would be forced to sue for violation of the restrictions. And Mr. St. Clair said 'Well, that is all right, we will still be friends, go ahead and sue.' And that is what happened."

Lauren B. Amsbary denied that he told the defendants that it would be all right with them if they rented rooms. His version of the conversation had on that occasion is embodied in the following testimony:

"Q. Now, Mr. Amsbary, this morning it has been testified to that you had a certain telephone conversation with the defendant James St. Clair, and he testified to the effect that you said it was all right for him to rent rooms, and if I got my notes correctly, you replied it was all right, just don't let old Colonel Wallace know. Did you make such a statement?

"A. Well, I didn't make that statement. If you would like I will tell you what I told him.

"Q. Just tell the Court in your own words what transpired?

"A. Well, I told Jim I would be awfully happy if he moved over there. And he said 'Well, what do you think about having a couple girls in the house?' And I said, 'Well, as far as I am concerned it wouldn't affect me one bit.' I said 'You have a neighbor next door, Dr. Biern, and you have Colonel Wallace that you should see.' And as far as I remember that is what I told Jim, and I think he understood it.

"Q. Did you ever agree with the St Clairs that you would not take any action to enforce the restrictions?

"A. Oh, no, I told him as far as I was concerned it wouldn't affect me one way or the other, but that there were restrictions in the block, that he should see the Colonel and Dr. Biern.

"Q. As far as you are concerned you are still a party to this suit and still willing for it to proceed, is that correct?

"A. As far as I am concerned the girls did not bother me one bit. It is a matter of breaking the restrictions."

Colonel George S. Wallace's version of his conversation with the defendants is stated in his testimony as follows:

"A. As I recall the conversation—and I recall it very clearly—one evening, I don't recall what week it was or the month, I don't know the date, Mr. St. Clair and his wife came to my house. It was getting along about dark. And we engaged a while in general conversations. And then Mrs. St. Clair—they were going out of the room—they told me that they wanted to take some roomers down there in their house to help them with the finances. And she went in some detail. And they wanted to know if—she said they talked to a good many people and they had agreed, and wanted to know what my attitude would be. Well, I was very careful, and I made just one reply. I said 'I will see Mr. Gohen.' I did not indicate anything at all, because I hadn't consented. And there was no reason for me to tell them what I was going to do. And I had a contract with my associates for the suit that was pending against the sorority.

\* \* \*

"A. When Mr. St. Clair came in I tried to be polite to him because his father was one of my close friends. And they did a good deal of talking. And I did not agree to a thing in the world. And finally Mrs. St. Clair, she took the initiative and she commenced to tell me about it, and I said to them— both of them—the only thing I did say was 'I will see Mr. Gohen.'

"I never agreed to anything. And didn't disagree. Because I didn't care to be disagreeable to them. But as it worked out I am sorry that I wasn't franker. I believe we would have gotten along better."

Wallace testified that he purchased his home in the restricted area about 1908; that he has consistently refused to consent to any violation of the restrictions in the 1500 block; that he and his neighbors "have had at least two suits before this Court, and we have tried to enforce them

and are enforcing them." He testified, as did Dr. Biern, that they are concerned only with the portion of Fifth Avenue between 14th Street and 16th Street. It is apparently conceded that the restriction has been violated in the 1400 block. Colonel Wallace stated that "I don't think I have enough interest down there to enforce them and spend money in a law suit."

The general rule is that, the unrestricted use of property by the owner being favored in law, restrictive covenants are strictly construed. *Ballard* v. *Kitchen,* 128 W. Va. 276, 282, 36 S. E. 2d 390, 393; *Neekamp* v. *Huntington Chamber of Commerce,* 99 W. Va. 388, pt. 2 syl., 129 S. E. 314; *Deutsch* v. *Mortgage Securities Co.,* 96 W. Va. 676, pt. 2 syl., 123 S. E. 793. If "there be doubt", or "if the language of a restrictive covenant, when read in the light which the context and surrounding circumstances throw upon it, remains of doubtful meaning, it will be construed against rather than in favor of the covenant." *Deutsch* v. *Mortgage Securities Co.,* 96 W. Va. 676, 681, 123 S. E. 793, 795. The rule of strict construction against the grantor in a deed and the rule that restrictive covenants are strictly construed may be resorted to only in case of ambiguity. *United Fuel Gas Co.* v. *Morley Oil & Gas Co.,* 102 W. Va. 374, 376, 135 S. E. 399. The rule "which declares that restrictive covenants are not favored simply means that all doubts are to be resolved in favor of the free alienation of real estate. Neither rule can operate when there is no room for doubt as to the intention of the parties." *Avis* v. *Virginian Railway Co.,* 124 Va. 711, 718, 98 S. E. 638, 640. Covenants in deeds as a part of the general scheme of development, though to be construed strictly, "cover things forbidden by necessary implication, just as they cover things named with unmistakable exactness." *Deitrick* v. *Leadbetter,* 175 Va. 170, 175, 8 S. E. 2d 276, 278.

"While the courts have manifested some disfavor of covenants restricting the use of property, they have generally sustained them where reasonable, not contrary to public policy, not in restraint of trade, and not for the purpose of creating a monopoly. It has been said that building restric-

tions have never been regarded as impolitic. The restrictions per se are not violative of the public good, inimical to public policy, or subversive of the public interests. So long as the beneficial enjoyment of the estate is not materially impaired and the public good and interests are not violated, such restrictions are valid. Subject to these limitations the court will enforce its restrictions and prohibitions to the same extent that it would lend judicial sanction to any other valid contractual relationship. Such restrictions do not restrict the alienation, for the owner of the fee can convey it at his pleasure, or tend to perpetuity, for the person who is entitled to the rights or privileges created or secured by the restriction can at any time release them." 14 Am. Jur., Covenants, Conditions and Restrictions, Section 206, page 616. "This rule of strict construction, however, obtains only where the parties have failed to express their meaning with sufficient clarity to enable the court to say that the construction of the deed is plain and admits of no doubt; the rule will not be applied to defeat the obvious purpose of the restriction, or the obvious intention of the parties, even though not precisely expressed, nor does it require an unnatural and strained construction of the words used; and before giving effect to the rule the court will have recourse to every aid, rule, or canon of construction to ascertain the intention of the parties, since it is the duty of courts to enforce, not to make, contracts. So, although restrictive covenants must be strictly construed, they cover things forbidden by necessary implication, just as they cover things named with unmistakable exactness." 26 C.J.S., Deeds, Section 163, page 1102.

In the case of *Cole* v. *Seamonds*, 87 W. Va. 19, 104 S. E. 747, the Court had under consideration a covenant by a grantor of land not to conduct or permit to be conducted on other land retained by him any mercantile business and not to permit intoxicants to be kept or sold thereon. The Court, in observing that such was "merely as a personal covenant between the parties", (pt. 5 syl.) distinguished that covenant from one of the nature now under consideration by use of the following language (104 S. E. at page 752): "Great latitude has been accorded by courts to prop-

erty owners with respect to the restrictions which they are permitted to impose upon the use of adjoining or neighborhood property. But, as noted above, the limitations ordinarily tend toward the physical or moral advantage of the property itself, either by way of improving the appearance of the neighborhood or district in which the property is situated or by way of preventing the entry of noisy, disorderly or otherwise obnoxious businesses or establishments into a quiet and orderly section." See also *United Fuel Gas Co. v. Morley Oil & Gas Co.*, 102 W. Va. 374, 380-381, 135 S. E. 399, 401.

Zoning regulations and building restrictions imposed by municipalities are an accepted part of modern community life. Similar ends are frequently accomplished in developments of residential areas, as in the present case, by the voluntary, contractual acts of property owners by means of restrictive covenants similar in nature to that which is herein involved. Such restrictive covenants are not against public policy. *Ballard v. Kitchen,* 128 W. Va. 276, 282, 36 S. E. 2d 391, 393. They do not place a restraint upon alienation. Their purpose is lawful and laudable. If the restrictions are reasonable in nature and purpose, they are upheld. Covenants of this nature are quite unlike covenants in restraint of trade, covenants in restraint of alienation, covenants purely personal in nature or covenants which merely impose a restraint upon one parcel of real estate for the benefit of another. Covenants of the type here under consideration are designed to be for the benefit of every lot or parcel of land in the area affected by the restriction. Each lot or parcel is not merely burdened by a restriction but it is also clothed with the benefit which is enforceable against every other lot or parcel. The burdens and benefits are reciprocal. The reasons for the rule of strict construction do not obtain with full force in such a situation. "Under the modern view, building restrictions are regarded more as a protection to the property owner and the public rather than as a restriction on the use of property, and the old-time doctrine of strict construction no longer applies." *Brandon v. Price* (Ky.), 314 S. W. 2d 521, 523; *Macy v. Wormald* (Ky.), 329 S. W. 2d 212, 214.

"Accordingly, in legal contemplation the servitude imposed on each lot runs to and attaches itself to each of the rest of the lots in the restricted area, thus forming a network of cross-easements or cross-servitudes, the aggregate effect of which is to impose and confer on each lot reciprocal and mutual burdens and benefits appurtenant to the lot, so as to run with the land and follow each lot upon its devolution and transfer. Thompson on Real Property, Permanent Edition (1940), Vol. 7, Sec. 3631; 14 Am. Jur., Covenants, etc., Sections 193 and 194." *Craven County* v. *First-Citizens Bank & Trust Co.*, 237 N. C. 502, 512, 75 S. E. 2d 620, 628. See also Tiffany, The Law of Real Property (3rd Ed.), Volume 3, Section 867, page 501.

The fundamental rule in construing covenants and restrictive agreements is that the intention of the parties governs. That intention is gathered from the entire instrument by which the restriction is created, the surrounding circumstances and the objects which the covenant is designed to accomplish. "The rule that restrictions as to the use of real estate should be strictly construed and all doubts resolved in favor of the free use of property should not be applied in such a way as to defeat the plain and obvious purposes of the contractual instrument or restrictions." 14 Am. Jur., Covenants, Conditions and Restrictions, Sections 211, 212, pages 620-621. "Building restrictions are looked on as more in the nature of a protection to the property owner and the public than as a restriction as to the use of the property." 26 C.J.S., Deeds, Section 164 (1), page 1107. "The number of decisions in comparatively recent years involving the validity, construction and effect of agreements restricting the use of real property indicate the increasing use being made of them. This reflects, it has been aptly commented, the expansion of the law to meet the demands of home owners for a protection adequate to the more crowded conditions of modern life. The basis of the modern rules for the enforcement of such restrictions is that one taking land with notice that it is subject to an agreement of this character will not, in equity and good conscience, be permitted to violate its terms." Tiffany, The Law of Real Property (3rd Ed.), Volume 3, Section 858, page 471.

Covenants similar to that involved in the present case have been upheld and enforced by this Court in numerous cases. *Ballard* v. *Kitchen*, 128 W. Va. 276, pt. 1 syl., 36 S. E. 2d 390; *Wolfe* v. *Landers*, 124 W. Va. 290, pt. 2 syl., 20 S. E. 2d 124; *Prindle* v. *Baker*, 116 W. Va. 48, pt. 1 syl., 178 S. E. 513; *Kaminsky* v. *Barr*, 106 W. Va. 201, 145 S. E. 267, pt. 1 syl., *Withers* v. *Ward*, 86 W. Va. 558, 104 S. E. 96; *Robinson* v. *Edgell*, 57 W. Va. 157, 160, 49 S. E. 1027, 1028. See also *Elterich* v. *Leicht Real Estate Co.*, 130 Va. 224, 107 S. E. 735.

In speaking of mutual covenants similar in nature to that involved in the instant case, arising out of real estate developments exclusively for residential purposes, this Court stated in *Robinson* v. *Edgell*, 57 W. Va. 157, 160, 49 S. E. 1027, 1028: "The most frequent illustrations of the application of the principle are found in cases involving the rights of parties holding by conveyance town lots, as subdivisions of a tract of land, the use of which had been limited by like, or similar, clauses inserted in all the deeds for the purpose of impressing upon all the property a certain character or quality, such as residence property. To the end that such property may be the more readily and advantageously sold, the use of each lot for trade, manufacturing, commercial, or business purposes is prohibited. Although the clause is not a covenant to do a beneficial act upon the property of the grantor, so as to directly annex to that property a benefit, but, on the contrary, binds the grantee to abstain from the doing, upon his own lot, of a certain act, a court of equity looks to the whole scheme as one intended to confer a benefit upon the property remaining in the hands of the grantor after the sale of each lot, and passing by subsequent conveyances to the grantees of other lots, as beneficial interests or rights attached to their lots, and therefore enforces observance of the provisions and restrictions, as readily as a court of law would award damages for the breach of a covenant annexed to real property in such a manner as to make it a covenant running with the land." The rights and responsibilities of the respective property owners in such a situation were considered by this Court in another case: "Where an owner of land divides it into lots and sells the lots to different grantees by deeds con-

taining the same negative or affirmative covenants, and the lots are sold to subsequent grantees, each will be charged with constructive notice of the covenants in the original deed under which he claims title. Though there would be no legal privity among the subsequent grantees and therefore one lot owner cannot maintain an action at law against the owner of any other lot, based upon the latter's violation of any of the covenants, a suit in equity may be brought by an original grantee or subsequent grantee against the owner of any other lot to compel compliance with the covenants contained in the original deeds on the theory that they created an equitable easement or servitude. * * * A court of equity will enforce such covenants, notwithstanding there may be no legal right, because of the derelict lot owner's inequitable conduct in the violation of the covenants." *Recco* v. *Chesapeake & O. Ry. Co.*, 127 W. Va. 321, 329, 32 S. E. 2d 449, 453.

It is apparent from authorities cited herein that the responsibility of a court in a case of this nature is to determine the intent of the parties to instruments creating or perpetuating the restrictive covenant, bearing in mind in that connection the surrounding circumstances and the purpose sought to be achieved thereby. 14 Am. Jur., Covenants, Conditions and Restrictions, Section 211, page 620. The rule of *ejusdem generis* will "not be applied in such a way as to defeat the plain and obvious purposes of a restriction." 14 Am. Jur., Covenants, Conditions and Restrictions, Section 213, page 622; 26 C.J.S., Deeds, Section 163, page 1094.

The complaint filed in the trial court alleges that when the land in the present restricted area was vacant, the owners thereof proceeded to develop such land as follows: "The former owners aforesaid considered and adopted a general plan presaging a highly restricted and attractive residential neighborhood. They, as a common source of title, sold all the lots in half blocks 165 and 166 to various purchasers in the years 1903-04, incorporating in each and every conveyance certain covenants restricting the use of the property conveyed." This allegation was not denied by the defendants. The deed of conveyance to the defendants made and

executed in 1960 contains the following language: "It is further understood and agreed that this conveyance is expressly made subject to those certain covenants and restrictions contained in a deed" which is described as a deed made in 1903 by the common grantors to one of the defendants' predecessors in title.

One portion of the restrictive covenant deals with the type of buildings which may be erected and another portion deals with the use which may be made of the buildings after their erection. It is not claimed that the building in question was erected in violation of the restrictive covenant. The complaint is that the building is used in a manner which is in violation of the restriction. Nevertheless, we must consider the covenant in its entirety in an effort to determine the intent and purpose thereof.

The portion of the covenant which deals with the erection of buildings contains the following language: "That there shall be no more than *one dwelling* and that *a single dwelling* erected on each 60 feet frontage * * *." (Italics supplied.) Another portion of the covenant dealing with the type of buildings which may be erected is as follows: "That there shall not be erected on said premises any building other than for *dwelling or residence purposes* or purposes of *like* nature." (Italics supplied.) A portion of the language dealing with the use which may be made of buildings erected on the premises is as follows: "* * * nor shall any building erected thereon be used for other than *dwelling or residence purposes,* or purposes of *like* nature * * *." (Italics supplied.) The word "like" is defined in Black's Law Dictionary (4th Ed.), as follows: "Equal in quantity, quality, or degree or exactly corresponding." We believe that such definition of the word is in the main sustained by cases cited in Words and Phrases (Permanent Edition), Volume 25, page 459.

We do not believe that the defendants' position is helped by the enumeration in another portion of the covenant of certain types of businesses for which a building may not be erected or used. For instance, the prohibitory language makes no reference to garages, service stations, hotels,

grocery stores, newspaper plants or florist shops; and yet it could not be contended plausibly that the restriction would permit the erection or use of a building for any such purposes. Ultimately, therefore, our task is to determine what, in the circumstances and background of the situation, was the intent, design and purpose of the language limiting each lot to "a single dwelling" and limiting the use of such single dwelling to "dwelling or residence purposes."

Webster's Third New International Dictionary, Unabridged, defines a dwelling as "a building or construction used for residence." The same dictionary defines a residence by using the following language: " (1) the place where one actually lives or has his home as distinguished from his technical domicile (2): a temporary or permanent dwelling place, abode, or habitation to which one intends to return, as distinguished from a place of temporary sojourn or transient visit (3): a domicilliary place of abode."

In the case of *State ex rel. Warner v. McGrath* (Ohio), 116 N. E. 2d 218, 220, the court quoted 1 Bouvier's Law Dictionary, Rowles Third Edition, page 962, as follows: "A dwelling is the building 'in which a man with his family resides.' " Thereafter the court stated: "The word 'residence' denotes something permanent and not merely temporary." In *Hartwig v. Grace Hospital,* 198 Mich. 725, 165 N. W. 827, it was held that a home for nurses of a nearby hospital was not a "residence" within the meaning of the language of a deed. In *Schadt v. Brill,* 173 Mich. 647, 139 N. W. 878, the court defined a dwelling as "the house in which a man lives with his family, a residence; the apartment or building, or group of buildings, occupied by a family as a place of residence." In *Nerrerter v. Little,* 258 Mich. 462, 465, 243 N. W. 25, 26, the court stated: "A restriction limiting the construction of a building on premises to a dwelling house means a building designed as a single dwelling to be used by one family. * * * The property itself is in a high-class neighborhood, wholly residential in character. The restriction goes to the use of the premises as well as the character of the building." In that case it was held that boarding and rooming a large number of children was a

violation of a covenant restricting buildings to dwelling houses or duplex dwelling houses.

In *Dingeman* v. *Boerth's Estate*, 239 Mich. 234, 214 N. W. 239, the court stated: "Could a lot owner erect a large single residence on his lot and then turn it into a hotel or boarding house and still claim to be using it for residence purposes? It seems to me obvious that such a use would violate the clear intent and purpose of the whole plan of development. Eating is one of the incidents of 'residing' on a lot as well as 'rooming' or sleeping on the premises. If one may conduct a business of renting rooms for hire and be within the restrictions, then one should also be entitled to conduct the business of renting rooms and serving meals (a hotel or boarding house), or the business of serving meals alone (a restaurant). But either use in my opinion would be conducting a business, and, consequently a violation of the restriction. So, too, running a rooming house or lodging house is clearly a business venture and contrary to the intent and purpose of the restrictive covenants." See also *Nerrerter* v. *Little*, 258 Mich. 462, 243 N. W. 25, 26. In *Macy* v. *Wormald* (Ky.), 329 S. W. 2d 212, 213, the court stated: "The noun 'residence' itself is singular, and the definitions in Webster's New International Dictionary all indicate that a residence is a dwelling place or abode of a single person or family unit. This is likewise the commonly understood meaning." In *Johnston* v. *Parkin*, 33 Ohio App. 174, 168 N. E. 755, 756, the court stated: "We are satisfied that the original allotter, when he used the expression 'only one residence shall be erected on any lot' intended that any residence building erected thereon should be used as a one-family residence, as the phrase is commonly used and understood by people who buy and sell real estate; * * *." In *Carr* v. *Trivett* (Tenn.), 143 S. W. 2d 900, 904, in holding that using four rooms of an eight-room house as a licensed tourist home was a violation of a covenant restricting use to residential purposes, the court stated: "Having in mind the type and character of subdivision which both complainants and defendants are presumed to have had in mind when defendants purchased their lot, we think such operations are beyond the spirit and purpose of the restrictions

and tend to break down the general protective force of this and other restrictions intended as a mutual benefit and protection to all parties who might establish private dwellings in that section."

In *Fortesque* v. *Carroll* (N. J.), 75 A. 923, the court stated: "The word 'building' connotes normally matters of construction, whereas the word 'residence' directs attention solely to a use or mode of occupancy to which a building may be put." In *Hunt* v. *Held*, 90 Ohio St. Rep. 280, 107 N. E. 765, the court stated that the words, "a private residence", or the words, "a single dwelling house" would indicate that the building was to be occupied by one family only. The following appears as a part of an annotation in 45 L.R.A. (N. S.), 727, 729: "A covenant against any building except 'a dwelling house' or 'one dwelling house' is generally interpreted to forbid any building except one designed for a single family * * *." The term "private residence or dwelling house" means "a dwelling house for a single family." *Ward* v. *Prospect Manor Corp.*, 188 Wisc. 534, 206 N. W. 856, 46 A.L.R. 364. In *Barnett* v. *Vaughan Inst.*, 134 App. Div. 921, 119 N.Y.S. 45, a private dwelling is described as "a place or house in which a person or family lives in an individual or private state." See also *Paine* v. *Bergrose Development Corp.*, 119 Misc. Rep. 796, 198 N.Y.S. 311, 312. In *Wood* v. *Blancke*, 304 Mich. 283, 8 N. W. 2d 67, 69, the court stated: "* * * covenants restricting the erection of any building except for dwelling house purposes have been held to apply to the use as well as to the character of the building; and in strictly residential neighborhoods, where there has always been compliance with the restrictive covenants in the deeds, nullification of the restrictions has been deemed a great injustice to the owners of property." The court in the same case points out that restrictions for residence purposes "are favored by definite public policy." A covenant restricting property to "residential purposes" was held to be violated by maintaining a tourist home wherein overnight accommodation is furnished to members of the traveling public. *Deitrick* v. *Leadbetter*, 175 Va. 170, 8 S. E. 2d 276, 127 A.L.R. 849. It was held that a covenant forbidding erection or use of buildings "for other than resi-

dence purposes" was violated by the incidental use of a dwelling for chicken dinner or restaurant purposes. *Hall v. Koehler,* 347 Mo. 658, 148 S. W. 2d 489.

Considering the covenant in its entirety, the circumstances attending its creation and the obvious purpose sought to be accomplished thereby, we are of the opinion that the trial court correctly held that the defendants' use of a portion of their dwelling as a rooming house constitutes a violation of the restriction.

The trial court correctly held also that the change in the neighborhood is not of such a nature as to constitute an abandonment of the restriction; that the plaintiffs cannot be said to have waived the restriction; and that the restriction is not void because of the failure of the original creators or common grantors to place identical restrictions on two of the lots in the 1400 block.

"The right to enforce building restrictions has been held an interest in land, and covenants restricting building and the use of the land have been held to constitute property rights, or they may create a property right. A restrictive covenant, as applied to land, constitutes an interest in the land in the nature of an easement, which is negative in character * * *." 26 C.J.S. Deeds, Section 162 (2), page 1087. See also 14 Am. Jur., Covenants, Conditions and Restrictions, Section 194, page 609. The nature of such a covenant was considered by the Court in *Withers v. Ward,* 86 W. Va. 558, 104 S. E. 96, by the use of the following language: "As before stated, these covenants run with and belong to the land. The right to have them enforced, so far as the plaintiff is concerned, is one that is attached to his real estate. It is a part of his real estate, and when the owner of another lot in the subdivision attempts to violate one of these restrictions he is taking from all the other owners part of their estate. He is not merely committing a trespass upon it. He is destroying it, * * *." In a subsequent case it was stated that such a restriction creates "an equitable easement or servitude." *Recco v. Chesapeake & O. Ry. Co.,* 127 W. Va. 321, 330, 32 S. E. 2d 449, 453. See also

Clark, Covenants and Interests Running With Land, (Second Edition), page 174.

Whatever may be the true and accurate characterization or nature of the right of each property owner, the fact remains that it is a valuable and substantial right, materially affecting the value of the property in the restricted area. Because of the substantial and valuable nature of the right, a property owner should not be denied the benefit of its enjoyment and enforcement except upon a clear showing and for cogent reasons.

"The willingness of some lot owners in a subdivision to waive a building restriction is not binding on others who insist on its strict observance; * * *." 26 C.J.S., Deeds, Section 169, page 1167. "One of the owners of property within such restriction is not estopped from invoking the restriction against an adjoining property owner by the fact that such complaining owner has theretofore not complained of violations of the restriction by other property owners, where such violations were inconsequential, or, if consequential, did not materially affect the party who later complained about a subsequent violation." *Kaminsky* v. *Barr*, 106 W. Va. 201, pt. 3 syl., 145 S. E. 267. To the same effect see *Ballard* v. *Kitchen*, 128 W. Va. 276, 283, 36 S. E. 2d 390, 394; *Pierce* v. *St. Louis Union Trust Co.*, 311 Mo. 262, 278 S. W. 398; *Ward* v. *Prospect Manor Corp.*, 188 Wisc. 534, 206 N. W. 856, 46 A.L.R. 364; *Schadt* v. *Brill*, 173 Mich. 647, 139 N. W. 878, 45 L.R.A. (N. S.) 726; *Goulding* v. *Phinney*, 234 Mass. 411, 125 N. E. 703; *Deitrick* v. *Leadbetter*, 175 Va. 170, 8 S. E. 2d 276, 127 A.L.R. 849; *Sayles* v. *Hall*, 210 Mass. 281, 96 N. E. 712.

The following appears as a part of an annotation in 46 A.L.R. at page 372: "Generally, acquiescence in violations of a restrictive covenant which are immaterial, and do not affect or injure one, will not preclude him from restraining violations of the restrictions which would so operate as to cause him to be damaged." "Mere 'acquiescence does not constitute abandonment so long as the restrictive covenant remains of any value' ". *Rogers* v. *Zwolak*, 12 Del. Ch. 200, 110 A. 674, 677. In *Bischoff* v. *Morgan*, 236 Mich. 251, 210

N. W. 226, 227, the court stated: "While defendants might have been litigious enough to have compelled observance by all builders within the scope of the restriction, yet their failure to prevent a violation not immediately detrimental to their enjoyment does not take away from them the right to have the restriction observed by plaintiffs, next door to their home."

It is immaterial that the restrictions were not identical throughout the restricted area. *Humphreys* v. *Ibach,* 110 N.J.E. 647, 160 A. 531; *Allen* v. *Barrett,* 213 Mass. 36, 99 N. E. 575; *Smith* v. *Graham,* 161 App. Div. 803, 147 N.Y.S. 773, 112 N. E. 1076; *Allen* v. *City of Detroit,* 167 Mich. 464, 133 N. W. 317, 36 L.R.A. (N. S.) 890; 14 Am. Jur., Covenants, Conditions and Restrictions, Section 202, page 614; 26 C.J.S., Deeds, Section 162 (1), page 1087. "A restriction as to lots within a particular block may be valid, although not imposed on the rest of the grantor's land." 26 C.J.S., Deeds, Section 162 (3), page 1093.

Mere acquiescence in violations will not constitute an abandonment thereof "so long as the restrictive covenant remains of any value." *Rogers* v. *Zwolak,* 12 Del. Ch. 200, 110 A. 674, 677. Changed conditions of the neighborhood will not be sufficient to defeat the right unless the changes are "so radical as practically to destroy the essential objects and purposes of the agreement." *Rombauer* v. *Compton Heights Christian Church,* 328 Mo. 1, 40 S. W. 2d 545, 553; *Deitrick* v. *Leadbetter,* 175 Va. 170, 8 S. E. 2d 276; *Humphreys* v. *Ibach,* 110 N.J.E. 647, 160 A. 531, 85 A.L.R. 980; *Pierce* v. *St. Louis Union Trust Co.,* 311 Mo. 262, 278 S. W. 398.

We are of the opinion that the trial court erred in holding that the plaintiffs "are estopped from complaining for failure to object prior to the purchase of the property by the defendants." If only one of the plaintiffs is entitled to enforce the restriction, it is immaterial that some of the other plaintiffs are not entitled to do so. *Smith* v. *Graham,* 161 App. Div. 803, 147 N.Y.S. 773. At the outset we observe in this connection, first, that the defendants themselves do not contend that Colonel George S. Wallace consented to their pro-

posal to keep roomers in their dwelling; and, second, they apparently concede that they did not apprise any of the plaintiffs that they proposed to take as many as eight roomers, or any other specific number, or that roomers were to be kept by them for a continuing but indefinite period of time in the future. It would be inequitable to preclude relief to the plaintiffs on the basis of estoppel for failure to speak if it appears that the defendants failed to apprise the plaintiffs fully concerning the nature of their proposed use of their dwelling.

"An estoppel cannot be based upon an uncertain state of facts." *Werner* v. *Hopkins,* 117 W. Va. 727, pt. 2 syl., 188 S. E. 128. The facts forming the basis of an estoppel "must be clearly proven and not capable of bearing any other construction." *Campbell* v. *Lynch,* 88 W. Va. 209, pt. 5 syl., 106 S. E. 869. See also *Bank of Sutton* v. *Skidmore,* 113 W. Va. 25, pt. 3 syl., 167 S. E. 144; *Pocahontas Light & Water Co.* v. *Browning,* 53 W. Va. 436, 44 S. E. 267; *Lorentz* v. *Lorentz, Ex'r,* 14 W. Va. 809, pt. 2 syl.; *Vanbibber* v. *Beirne,* 6 W. Va. 168, pt. 1 syl. "Mere silence will not work an estoppel; to be effective it must appear that the person to be estopped has full knowledge of all the facts and of his rights, and intended to mislead or at least was willing that another party might be misled by his attitude." *Campbell* v. *Lynch,* 88 W. Va. 209, pt. 6 syl., 106 S. E. 869. "There can be no acquiescence without knowledge." *Cautley* v. *Morgan,* 51 W. Va. 304, pt. 2 syl., 41 S. E. 201. It is essential to estoppel that the one claiming the benefit thereof must have relied to his disadvantage on the acts, conduct or representations of the one alleged to be estopped. *Greco* v. *Meadow River Coal & Land Co.,* 145 W. Va. 153, 164, 113 S. E. 2d 79, 86; *Stuart* v. *Lake Washington Realty Corp.,* 141 W. Va. 627, 650, 92 S. E. 2d 891, 904; *Fisher* v. *West Va. Coal & Transportation Co.,* 137 W. Va. 613, 625, 73 S. E. 2d 633, 640; *Spradling* v. *Spradling,* 118 W. Va. 308, pt. 3 syl., 190 S. E. 537; *Bank of Sutton* v. *Skidmore,* 113 W. Va. 25, pt. 3 syl., 167 S. E. 144; *Toro* v. *Shilling,* 108 W. Va. 612, pt. 3 syl., 152 S. E. 6. It is reasonably apparent that the defendants relied in part at least on a belief that, from a legal standpoint, the keeping of the eight roomers in their home

was not inhibited by the restrictive covenant. Furthermore, it is only in a restricted sense that the defendants claim to have been misled to their disadvantage. They purchased the property as a home for themselves, they are using it as their home, and it does not appear that they have expended any money or labor except of a nature to improve the dwelling in which they live. "The doctrine of estoppel is arbitrary in its very nature. It is invoked only in the interests of justice. Even then, it contravenes the technical, legal rights of the party estopped. For this reason, courts have been slow and careful in their application of the doctrine of estoppel." *Spradling* v. *Spradling,* 118 W. Va. 308, 312, 190 S. E. 537, 540. "The burden is on the asserter of an estoppel *in pais* to prove his reilance on, and injury from the representations or conduct of the one against whom the estoppel is claimed." *Brotherhood Investment Co.* v. *McArthur,* 110 W. Va. 326, pt. 2 syl., 158 S. E. 175.

The case of *Ballard* v. *Kitchen,* 128 W. Va. 276, 36 S. E. 2d 390, is distinguishable from the present case for several reasons. The *Ballard* case involved both laches and estoppel. For more than twenty years the plaintiff acquiesced in the violation. The plaintiff, without protest, observed that printing equipment was being installed on the defendants' premises which were restricted to dwelling and residential purposes, and acquiesced in the operation of a printing business on the defendants' premises for a long period of years. In the meantime the plaintiff, without any protest on his part, but with full knowledge of the facts, observed over a period of six years that the defendants were making large expenditures of money and labor in equipping their printing plant with an expensive press, linotype and other equipment.

For reasons stated herein, the judgment of the Circuit Court of Cabell County is affirmed to the extent that it was thereby adjudged that there has not been a change in the character of the neighborhood sufficient to constitute an abandonment of the restriction; that the plaintiffs have not waived the restriction as it relates to the defendants' property; and that the action of the defendants in keeping in their home eight female students as roomers for compen-

sation constitutes a violation of the restriction; but the judgment is reversed to the extent that it was thereby adjudged that the plaintiffs are precluded by estoppel from enforcing the restriction against the defendants and their property. Accordingly, the case is remanded to the circuit court for such further proceedings consonant with this opinion as may be required.

*Affirmed in part;*
*reversed in part;*
*and remanded.*