705 S.E.2d 816

**Jason FOSTER, Plaintiff Below, Appellant**

v.

**ORCHARD DEVELOPMENT COMPANY, LLC, a West Virginia Limited Liability Company, and Peteler, LLC, a West Virginia Limited Liability Company, Defendant Below, Appellee.**

No. 35308.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 7, 2010.

Decided Nov. 23, 2010.

Gregory A. Bailey, Esq., Christopher P. Stroech, Esq., Arnold & Bailey, PLLC, Shepherdstown, WV, Attorneys for Appellant.

Joseph L. Caltrider, Esq., Bowles, Rice, McDavid, Graff & Love, Martinsburg, WV, Attorney for Appellee Orchard Development Company, LLC.

PER CURIAM:

## I.

## FACTUAL AND PROCEDURAL HISTORY

This appeal arises from the denial of a permanent injunction to stop the building of townhouses as well as a grant of summary judgment in favor of the appellees, Orchard Development Company, LLC (hereinafter referred to as "Orchard") and Peteler, LLC (hereinafter referred to as "Peteler"), and against the appellant Jason Foster, regarding the applicability and meaning of certain restrictive covenants and other regulations affecting The Gallery subdivision (hereinafter referred to as "The Gallery") in Martinsburg, Berkeley County. The appellant, Jason Foster (hereinafter referred to as "Foster") is the owner of a single-family residence in The Gallery. He purchased this house in June or July of 2007, for the sum of $282,500. Orchard is the developer of The Gallery Subdivision. Peteler is a builder who purchased several tracts of land from Orchard with the intention of constructing 100 townhouses within The Gallery subdivision.

The Gallery subdivision was established after Orchard purchased a tract of land from the C.J. Seibert Orchard Company. Orchard began developing The Gallery in 2004, with plans calling for a mix of single family homes and townhouses. Orchard marketed this subdivision as Martinsburg's premier subdivision and as a planned community[1], within the definition of W. Va.Code § 36B–1–101(2005), et seq.[2] A maximum of 2,000 units were planned for The Gallery subdivision. When this litigation began, Orchard was still the owner of a majority of the lots and development was continuing within the subdivision.

After its first acquisition of property, Orchard wrote and recorded a document entitled "Declaration of Covenants, Conditions and Restrictions for the Gallery Subdivision," (hereinafter referred as the Covenants) in the Berkeley County Clerk's office. After later property acquisitions, Orchard recorded a supplemental document acknowledging the applicability of the Covenants to every unit in the subdivision, regardless of whether the deed specifically references the Covenants.

The Covenants established The Gallery as a planned community, and tracked the language of the Uniform Common Interest Ownership Act, W. Va.Code § 36B–1–101 (hereinafter referred to as "the Act.") Throughout the Covenants, individual homes within the subdivision were referred to as "units." The word unit applies to single family homes as well as townhouses.

In order to establish a mechanism for control of the common interest areas of the subdivision, the Covenants established a homeowners' association known as "The Gallery Subdivision Unit Owners Association, Inc.," (hereinafter referred to as the Association). The association was incorporated by G. Timothy Shaw, a member of Orchard, as a non-profit West Virginia corporation on January 10, 2005. While each unit owner in The Gallery subdivision was a member of the Association, the actual management of the Association fell to an Executive Board. The initial members of the Executive Board were G. Timothy Shaw and Robert C. Adams, members of Orchard Development; James M. Siebert, a realtor; and Telena A. Spies, another realtor.

The Covenants established in Article VIII Section 8.10, that "there shall be a period of Orchard Development control of the Association, during which Orchard Development, or

---

**1.** A planned community is defined in W. Va.Code § 36B–1–103 as "... a common interest community that is not a condominium or a cooperative. A condominium or cooperative may be part of a planned community."

**2.** West Virginia's Uniform Common Interest Ownership Act based upon the Uniform Common Ownership Act. The Uniform Law Commissioners state that the Act "is a comprehensive act that governs the formation, management, and

termination of a common interest community, whether that community is a condominium, planned community, or real estate cooperative. It also provides for disclosure of important facts about common interest property at sale to a buyer, including resale disclosure for any sale after the initial sale by the developer of the property; for warranties of sale; for a buyer's recision rights in a sale contract, and for escrow of deposits made to secure a sale contract."

persons designated by Orchard Development, may appoint and remove officers and members of the Executive Board." It was only after seventy-five percent (75%) of the lots were sold, or two years after Orchard ceased selling lots within The Gallery subdivision that control of the Executive Board would be granted to the unit owners as opposed to Orchard, the developer.

The Covenants also reserved certain rights to the Orchard Development, which must be exercised within 15 years after the recording of the Covenants. These rights were enumerated in Section VIII as follows:

### ARTICLE VIII

*Development Rights and Other Special Declarant Rights*

**Section 8.1 Reservation of Development Rights.** The Declarant reserves the following Development Rights which may be exercised individually or in any combination:

(a) The right by amendment to add real estate to the Common Interest Community.

(b) The right by amendment to create Units, Common Elements, or Limited Common Elements within the Common Interest Community.

(c) The right by amendment to subdivide and combine Units or convert Units into Common Elements.

(d) The right by amendment to withdraw real estate from the Common Interest Community.

(e) The real estate to which the Development Rights specified in Paragraph D is shown on Schedule 7.[3]

Section 8.4 reserved Special Declarant Rights, including the right to appoint or remove an officer of the Association or Master Association or an Executive Board or Master Executive Board member during a period of Declarant control subject to the provisions of 8.10 of the Covenants.

The Covenants also established land use and restriction rules in Article X, Section 10.1. The first restriction is that "All units shall be used for single-family residences only. No commercial or retail businesses shall be permitted on any Unit." Also restrictions included prohibitions against subdivision of lots, commercial vehicles, unregistered vehicles, campers, above-ground storage tanks, yard art, clotheslines as well as other requirements.

The Covenants detailed a mechanism by which the covenants themselves could be modified. In Article XIV, Section 14.1 of the Covenants the amended procedure is as follows:

> [T]his Declaration, including the Plan and Plans, may be amended only by vote or agreement of Unit Owners of Units to which at least sixty-seven percent (67%) of the votes in the Association are allocated.

In Article XIV, Section 16.4(a) of the Covenants, document amendment is detailed as follows:

> Document changes. Notwithstanding any lower requirement permitted by this Declaration or the Act, no amendment of any material provision of the Documents by the Association or Unit Owners described in this Subsection 16.4(a) may be effective without the vote of at least sixty-seven percent (67%) of the Unit Owners.

The word "documents" is defined in Article 1, Section 1.16 of the Covenants as:

> The Declaration, Plan and Plans recorded and filed pursuant to the provisions of the Act, the Bylaws, Articles and the Rules of the Association as they be amended from time to time. Any exhibit, schedule or certification accompanying a Document is part of that Document.

The Covenants themselves did not reference minimum unit size or other particulars about the construction of homes in The Gallery Subdivision. Instead, the Covenants established a committee known as The Gallery Subdivision Architectural and Development

---

**3.** Schedule 7 of the Declaration of Covenants, Conditions and Reservations listed this real estate as "Roads of the Subdivision which currently include Botecelli Court, Dali Court, Rubens Circle and a portion of Klee Drive as shown on the plat of record for Section 1, Phase 1 of The Gallery Subdivision.

Review Committee, known generally as the "Review Committee", in Article I, Section 1.32, as the entity responsible for approving the plans for each unit with The Gallery Subdivision. The Executive Board of the Association was charged with establishing the Review Committee. Article XXIV, Section 24.2 of the Covenants provides that more than one-half of the members [of the Review Committee] shall be appointed by [Orchard Development] and the remaining members appointed by the Association. As such, Orchard Development controlled the composition of the Review Committee. Moreover, during this ·period, Orchard controlled the Executive Board of the Association pursuant to the Covenants.

The duties of the Review Committee were in part to approve building plans within The Gallery, utilizing a set of "Design Development Guidelines," (hereinafter referred to as "Design Guidelines.") The Design Guidelines are defined in Section 1.13 of the Covenants as "[t]he design guidelines established by the Unit Owners Association for the design and construction of improvements on individual units." It is in the Design Guidelines that the first mention of minimum square footage is made. As for the intent of the Design Guidelines, it is stated:

> "The primary areas of concern addressed by these Guidelines are Site Development and Architectural Appearance, especially as these relate to harmonious relationships with the existing terrain and among neighboring structures. In general, the goals are to minimize harsh contrasts in the landscape and architectural context, to conserve pleasing and significant natural systems and to encourage unassuming architecture appropriate to this unique environment."

Within the Design Guidelines was a statement that the guidelines apply to all properties within The Gallery subdivision, and that they are subject to federal, state and city regulations, as well as zoning and subdivision requirements and building codes, "whichever criteria are most restrictive." The Design Guidelines also contain a statement that they may be revised "as changing conditions and priorities dictate, in order to maintain maxi-

mum real and aesthetic benefits to The Gallery property."

Unlike the Covenants, the Design Guidelines were not recorded in the county clerk's office. However, the Design Guidelines are referenced throughout the Covenants. The Design Guidelines establish a design review process, by which a lot owner would have to seek prior approval of the Review Committee of any home building or renovation plans. The Design Guidelines begin with the aforementioned Intent section and a recommendation that all persons proposing any construction seek the assistance of a qualified design professional, such as an architect, landscape architect, civil engineer or surveyor. They next include a series of general rules, the first of which addresses the minimum size of all single-level homes. These Design Guidelines state that "the ground floor area of all single-level homes or residences shall contain a minimum area of One Thousand Seven Hundred (1,700) square feet, exclusive of garage and porches, and the entire floor area of all homes or residences of more than one (1) level or story shall contain a minimum area of One Thousand Seven Hundred (1,700) square feet, exclusive of garage and porches." As is the case with the Covenants, the Design Guidelines detail many restrictions over what may be built, including a prohibition on mobile, manufactured, prefabricated or modular homes, a ban on above-ground swimming pools and "no construction of anything at all, even a mailbox post, without written approval by "the Developer or Architectural Review Committee, as controlled by the Declaration of Covenants and Restrictions."

In a Summary section of the Design Guidelines, the goals, purposes and intentions of the Design Guidelines was stated to be:

> [T]he intent of these standards is to provide a basis for harmonious treatment of visible development within this unique environment, so that all who live here can expect to continue to enjoy their surroundings. At the same time, · the desire of individuals to develop a living space that contains some personal expression must be considered. Accordingly, these Design

Guidelines have been developed with a great deal of attention paid to goals and concepts and less attention to detail, except where such detail is considered essential. It will be the difficult duty of the Review Committee to interpret those goals and concepts in a consistent manner, always attempting to keep the best interest of The Gallery community in mind.

The legal authority for the Design Guidelines was set forth within the document itself. The declaration was:

Authority for design review is grounded in the governing document for The Gallery Subdivision community, the "Declaration of Covenants, Conditions and Restrictions of the Gallery Subdivision." Article XXIV of the Declaration of Covenants, Conditions and Restrictions of The Galley Subdivision hereby adopts these Design Guidelines as the basis for all design review. Should these Guidelines be revised, such revisions shall then take precedence over previous guidelines.

The Design Guidelines were, as indicated above, subject to revision. Within the Design Guidelines was the mechanism for the Association, through the Review Committee, to revise these Design Guidelines as well as to interpret their application. Prior to the instant dispute, the Review Committee made what the circuit court deemed "on-the-fly" and unilateral revisions to the Design Guidelines, without formally complying with the procedures proscribed by the Design Guidelines themselves, under the belief that since they constituted the entire voting majority of the Association and Review Committee, they did not need to proceed with the formal mechanism to make changes. One example of the changes allowed was to increase the height of privacy fencing at the rear of each lot from four feet to no more than eight feet, in September of 2005.

The circuit court found that prior to closing, purchasers of residential units in The Gallery were provided copies of the Covenants, the Design Guidelines and possibly other documents, including a plat of the subdivision. The appellant admitted that he received these documents.

The Covenants as well as the Design Guidelines were summarized in a one-page document entitled "Brief of building requirements for The Gallery (single family)" dated June 25, 2004. This summary stated that it was merely a quick reference and was not a part of the actual binding documents. The summary included a statement that "[t]he covenants and design guidelines control the actual requirements and should be referred to for the actual requirements." The summary included the minimum square footage requirement of 1,700 square feet of living space, excluding garages, porches and decks as well as other building requirements.

On April 23, 2008, the appellee Peteler purchased seven lots in The Gallery Subdivision, with intentions of building 100 studio town homes. The initial number to be built was seven. These town homes were smaller than other existing townhouses in the subdivision. The proposed size of each of these townhomes was 800 square feet. On April 30, 2008, the Review Committee, which was still controlled by Orchard, approved Peteler's proposal to construct seven studio townhouses on these lots. Construction commenced in May of 2008. At this same time, Peteler began advertising the availability of these studio townhomes for sale. The advertised price of each studio townhome was $124,500, and each unit consisted of 800 square feet of living space, with two bedrooms and one and a half baths. With the start of construction and advertisement of the small studio townhomes, the appellant on May 27, 2008, wrote a letter to the appellees demanding that the construction on units cease as he contended they were not in compliance with the minimum square footage requirement required by the Covenants and stated in the Design Guidelines.

Under this threat of litigation, the Executive Board of the Property Owners Association proposed a "Consent Resolution". This resolution stated that the Directors of the Executive Board of The Gallery Subdivision Unit Owners Association, Inc., "hereby express their unanimous agreement in writing to the following corporate actions and direct that this consent be filed with the minutes of the proceedings of the Board of Directors of

the Corporation." This resolution stated that in order to clarify the Design Development Guidelines for multi-family attached structures in The Gallery Subdivision, the Design Guidelines General Rules, Section 1 would have to be amended to eliminate the following sentence: "The ground floor area of all single-level homes or residences shall contain a minimum area of One Thousand Seven Hundred (1,700) square feet, exclusive of garage and porches, and the entire floor area of all homes or residence of more than one (1) level or story shall contain a minimum area of One Thousand Seven Hundred (1,700) square feet, exclusive of garage and porches."

As amended, the new Section 1 of the General Rules of the Design Development Guidelines, would read as follows: "Each structure placed on each individual lot in The Gallery Subdivision, except for approved outbuildings, shall contain the following minimum finished living area, exclusive of garages and porches:

| TYPE OF STRUCTURE | MINIMUM FINISHED LIVING AREA |
| --- | --- |
| *Single Family Structures:* | |
| Single Family Home (one story) | 1700 sq. ft. (ground floor area) |
| Single Family Home (two or more stories) | 1700 sq. ft. (total floor area) |
| *Multi–Family Structures:* | |
| Town Home (three or more stories) | 1200 sq. ft. (total floor area for each unit) |
| Studio Town Home (two stories) | 750 sq. ft. (ground floor area for each unit) |
| Villa/Duplex (one story) | 750 sq. ft. (ground floor area for each unit) |
| Villa/Duplex (two or more stories) | 750 sq. ft. (total floor area for each unit) |

The stated purpose for these amendments was "to preserve the existing minimum area requirements for single family detached homes and add the minimum area requirements for multi-family attached structures which have been previously adopted on a case-by-case basis by the Executive Board of The Gallery Subdivision Unit Owners Association, Inc. This amendment was distributed to the homeowners of The Gallery Subdivision. At a July 28, 2008, meeting of the Executive Board of the Association 150 unit owners objected in writing to the proposed amendments. Despite the protest, the Executive Board ratified the proposed amendment. On August 7, 2008, the Review Committee considered and ratified the Executive Board's consent resolution. At this point the Design Guidelines were modified and amended to allow for the building of the proposed studio townhomes or villas.

Foster instituted a case in the Circuit Court of Berkeley County on June 5, 2008, after Peteler began construction of a group of villas whose living area, exclusive of garages and porches, was approximately 800 square feet. A jury trial was demanded. Foster sought injunctive relief to halt the construction of these villas, alleging that the proposed size of each villa was under the minimum size required by the subdivision's restrictive covenants. The restrictive covenants and other documents regarding design of homes within the subdivision shall be more fully detailed herein. Foster sought a temporary restraining order[4] requiring Peteler to cease construction of the villas, as well as a preliminary injunction[5] to enjoin Peteler from any further construction of the villas until such time as a final determination on the merits of his claim could be made. Fos-

---

4. A temporary restraining order was entered by order of the circuit court on June 10, 2008. In this order the circuit court scheduled further hearing on the issue of the preliminary injunction.

5. The preliminary injunction was denied by order of the circuit court entered June 26, 2008.

ter also sought a permanent injunction to forever enjoin Peteler and Orchard from construction of the subject villas, or any other unit that violated the restrictive covenants governing land use within the subdivision. Foster alleged that there would be irreparable harm to the value of his property if the smaller townhouses were allowed to be built. A claim was made for foreseeable and consequential damages, including attorney fees and costs. Orchard filed an answer and counterclaim to Foster's action on June 25, 2008, seeking damages for the appellant's malicious prosecution of his claim for injunctive relief.

The circuit court heard testimony in a series of hearings on the issue of the temporary restraining order, the preliminary and permanent injunction and on each party's motion for summary judgment. The appellant testified about why he purchased his home in The Gallery. The appellant testified that all the homes in the subdivision appeared well-kept and were all relatively large, with some being larger than the others. He was aware that there were town houses within the subdivision, but he testified that they were large, well kept and very nice. The appellant testified that "the development was very uniform and from all representations that were made to us by the real estate agent it was supposed to be the premier development of Berkeley County."

The appellant also testified about his inquiry into and knowledge of the covenants governing the subdivision. The appellant testified that while he received a copy of the covenants affecting The Gallery prior to closing or at the closing, he did not review them prior to purchase. Further he testified that he was not aware of any minimum square footage requirement but because all of the homes in the development were of the same size that he assumed that such a requirement was contained in the Covenants.

On the issue of whether he understood that the appellee retained control of the development, the appellant testified that he was familiar with the concept of developer control of a subdivision for a period of time, and that he was not surprised that the appellee maintained control of The Gallery. The appellant also agreed that he expected that there would be changes to both the Covenants and the Design Guidelines. Regarding the Design Guidelines, the appellant stated: "I never once said they cannot be changed. As a matter of fact, they can be changed, but they have to go through the proper process."

Testifying on behalf of the appellees was G. Timothy Shaw, a member of Orchard Development who also served on the Executive Board of the Association, who stated that it was always the intention of Orchard for the 1,700 square footage requirement to be for detached, single-family homes as opposed to townhouses.

On the issue of the appellant's claim of diminution of the value of his house, the circuit court heard the testimony of Foster and of Gregory J. Didden, a realtor with 43 years of real estate sales experience and a familiarity with the Eastern Panhandle real estate market. The appellant testified that believed that the construction of the smaller villas would diminish the value of his home. Didden opined that the construction of town homes or studio town homes does not necessarily diminish the value of single family homes in a subdivision. He opined that the construction of the homes could enhance rather than diminish the value of surrounding homes. Foster conceded at one hearing that he could not see the smaller townhomes from his house and that he did not have any particular expertise in the field of real estate.

On September 30, 2008, the circuit court denied the appellant Foster's motion for summary judgment, and granted summary judgment in favor of Orchard and Peteler. The circuit court also denied the request for injunction by Foster. The circuit court further denied Foster's motion for partial summary judgment and granted the motion for summary judgment in favor of Peteler and Orchard. In its 30–page order, the circuit court found that when viewing the entire plan for developing The Gallery subdivision, it was undisputed that Orchard intended to retain the benefit of the recorded covenants as well as the separate, more flexible Design Guidelines so that it could "meet changing market conditions and sell all two thousand (2,000) lots/units it has planned for The Gal-

lery." Thus, the lower court viewed the Covenants and Design Guidelines as two separate and distinct documents. Specifically, the lower court's order stated:

When the Court views the entire scheme for The Gallery created by Orchard Development through the recorded Covenants and the separate, unrecorded Design Guidelines, and against the backdrop of the pattern of development within The Gallery where the living space minimums as expressed in the Design Guidelines have been historically applied only to detached single-family houses, the Court finds that these documents are unambiguous and were intended to provide Orchard Development and the Review Committee with flexibility, enough flexibility to allow Peteler's eight hundred (800) square foot studio town homes as part of The Gallery."

The circuit court's order also found that the Design Guidelines unequivocally anticipated revisions when the Review Committee's rights to revise the Design Guidelines "as changing conditions and priorities dictate, in order to maintain maximum real and aesthetic benefits to The Gallery property." And while noting that the amendments to the Design Guidelines took place against the threat of litigation, and were not final until after the instant litigation was commenced, the lower court found that the Review Committee explicit adoption of the new Design Guidelines was an affirmation and approval of the appellee Peteler's plan to build smaller town homes within the subdivision and the Review Committee's rights to revise the Design Guidelines as well as to interpret the guidelines in effect at the time.

The lower court found that the appellees properly amended the Design Guidelines, even while the litigation was pending, through the procedure pronounced in the Design Guidelines themselves. The appellant had argued that the Design Guidelines, being part of the Covenants, were subject to the amendment process for the Covenants that required the vote of at least sixty-seven percent (67%) of the unit owners. The circuit court found that the Design Guidelines were not part of the Declaration, Plat and Plans of The Gallery, and also found that the

Design Guidelines did not fall with the definition of Documents, and therefore, changes in the Design Guideline were intentionally excluded from the amendment process detailed in the Covenants.

The circuit court found that there was no issue of fact for a jury to determine whether the Review Committee's revisions did "maintain maximum real and aesthetic benefits to The Gallery's property" because that was not an issue before the lower court. The issue before the circuit court was whether the Review Committee gave consideration to whether Peteler's studio town homes "maintain maximum real and aesthetic benefits to the Gallery Property." The Design Guidelines gave this discretion to the Review Committee, and the circuit court found that submitting this subjective standard to a jury would invite the jury to substitute its judgment for that of the Review Committee, obviating the discretion specifically granted to the Review Committee. Any time a unit owner would disagree with the Review Committee's actions, he or she could undermine the authority of the Review Committee by filing suit and demanding a jury trial. Relying upon the testimony of Mr. Didden and Mr. Shaw, the lower court found that the Review Committee gave due consideration to maximum real and aesthetic benefits to The Gallery property, which was all that was required under the Design Guidelines. As such, there was no genuine issue of material fact barring entry of an order of summary judgment.

On the issue of the appellant's fear of diminished value of his real estate, the circuit court found that the appellant's fears that the smaller town homes would "completely change the character of the community by devaluating the property of other unit owners" was subjective and not supported by the objective testimony contained in the record. The lower court relied upon the testimony of local realtor, Gregory J. Didden. Mr. Didden testified that he did not believe that the smaller town homes would diminish the value of the surrounding units and could increase their value.

The lower court also rejected the argument of Foster that the ability of Orchard to

unilaterally amend or in any manner alter the Design Guidelines is unconscionable and therefore void, within the definition of West Virginia Code § 36B–1–111(b). The circuit court found that the development scheme for this subdivision, with control being retained by Orchard, was not unusual for this type of real estate development and further, that this scheme was known or available to the appellant before he purchased his home. Thus, the Covenants and Design Guidelines were not unconscionable.

## II.

## STANDARD OF REVIEW

■ This appeal arises from the circuit court's failure to grant injunctive relief and from a grant of summary judgment. Our standard of review is deferential on the question of whether to grant the injunctive relief. "Unless an absolute right to injunctive relief is conferred by statute, the power to grant or refuse to modify, continue, or dissolve a temporary or a permanent injunction, whether preventative or mandatory in character, ordinarily rests in the sound discretion of the trial court, according to the facts and the circumstances of the particular case; and its action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion." Syllabus Point 11, *Stuart v. Lake Washington Realty*, 141 W.Va. 627, 92 S.E.2d 891 (1956).

■ On the issue of whether summary judgment is appropriate, our standard of review is *de novo*. "A circuit court's entry of summary judgment is reviewed *de novo*." Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

With these standards of review we address the issues presented.

## III.

## DISCUSSION

The appellant assigns the following errors to the lower court's rulings: 1) the circuit court erred by determining that the Covenants and Design Guidelines are separate and distinct documents; 2) the circuit court erred by determining that the Orchard may unilaterally amend the minimum square footage requirements and 3) the circuit court erred by determining that there were no genuine issues of material fact regarding the unilateral amendment of the square footage requirement.

## 1. The Covenants and Design Guidelines

■ At issue is whether the Covenants and the Design Guidelines are separate documents, as the circuit court ruled in denying the appellant's request for a permanent injunction, or are part of the same documents that govern construction within The Gallery subdivision. The significance of this determination cannot be understated. It is only in the Design Guidelines that any mention is made of a minimum square footage requirement for homes in The Gallery subdivision. The Covenants do not explicitly mention the size of housing units within the subdivision, but do establish the existence of the Design Guidelines and Review Committee, among whose duties is to interpret the Design Guidelines as established by the Executive Board. The appellants argue that the Design Guidelines must be read in conjunction with the Covenants, and that the two may not be separately interpreted. The appellees contend that the Covenants and the Design Guidelines were intended to be separate documents, as shown by the language of the documents themselves.

The circuit court ruled that the Covenants and the Design Guidelines were intended to be separate documents.

The circuit court reasoned that the intent of the developer was to created a set of stringent conditions, covenants and restrictions in the Covenants themselves, but to utilize a more flexible method to govern the construction of homes with The Gallery subdivision. Thus, the developer could meet changing market conditions and sell the 2,000 units it had planned for The Gallery subdivision. When the market conditions dictated the feasibility of seller smaller townhouses than were originally anticipated for the subdivision, the appellees were able to market these new dwellings by amending the Design Guidelines. Under the appellant's view of

the subdivision regulations, the Covenants and Design Guidelines are interrelated and cannot be read separate and apart from one another.

■ We have held that in terms of constructing the various restrictions contained in covenants affecting real estate usage, intent is the key factor. " 'The fundamental rule in construing covenants and restrictive agreements is that the intention of the parties governs. That intention is gathered from the entire instrument by which the restriction is created, the surrounding circumstances and the objects which the covenant is designed to accomplish.' *Wallace v. St. Clair*, 147 W.Va. 377, 390, 127 S.E.2d 742, 751 (1962)." Syllabus Point 2, *Allemong v. Frendzel*, 178 W.Va. 601, 363 S.E.2d 487 (1987).

Examining the documents establishing The Gallery subdivision in terms of the developer's intentions, we find several obvious indicators of the intentions of the appellee to maintain the distinctions and separations of the Covenants and the Design Guidelines. The first is contained in the Covenants themselves, when they specifically define the Design Guidelines as a document established separately by the Property Owners Association.[6] The next indication of the intent of the appellees in creating these two separate documents was the fact that the Design Guidelines were not recorded in the same manner as the Covenants were.

The appellant argues that the failure to record the Design Guidelines does not render them separate from the Covenants or unenforceable. The appellant cites the case of *Armstrong v. Stribling*, 192 W.Va. 280, 452 S.E.2d 83 (1994) in support of his position that the restrictions contained in unrecorded documents may be enforced by subsequent purchasers. In *Armstrong*, the subsequent purchasers of a tract of land that had previously been included in a unrecorded subdivision map attempted to circumvent the subdivision's restrictive covenants by claiming their tract of land was not included in the original subdivision plan. The

circuit court held that the unrecorded subdivision plat indicated the developer's intention to include this tract within the subdivision, and that the land was subject to the rules and regulations governing other properties within the subdivision. While we agree with our previous holding in *Armstrong*, in the case at bar, the failure to record is further proof of the appellee's intentions of separation of the Covenants from the Design Guidelines. We believe that the evidence below clearly supported the circuit court's findings that the unrecorded nature of the Design Guidelines fell within the conceived plan for the changing developmental needs of the subdivision. Had the appellee intended for the Design Guidelines to be held to the same standard of interpretation and amendment as the Covenants, it would not have created a separate unrecorded document.

## 2. The amendment process for the Covenants and the Design Guidelines

We next address the appellant's contention that the Design Guidelines were improperly amended. While the amendment of these Design Guidelines happened after the construction of Peteler's smaller townhouses started, the amendments followed the designated procedure for changes to the Design Guidelines. The appellant urges this Court to find that the appellee did not have the ability to unilaterally modify either the Covenants or the Design Guidelines. The circuit court disagreed with the appellant's contention that because the Design Guidelines were part of the covenants, the Design Guidelines were subject to the amendment process defined within the Covenants themselves. The circuit court found that if this were a correct interpretation of the documents, the Review Committee's authority to revise these documents would be nullified. Instead, the property owners would be placed in the role of revisers to requirements for construction within the subdivision. This is especially problematic when the developer remains the

---

6. Article 1, Section 1.13 of the Covenants contains the definition for the Design Development Guidelines. This definition states: "The design guidelines established by the Unit Owners Association for the design and construction of improvements on individual units."

owner of a majority of the lots of the subdivision.

Instead, because the Covenants and Design Guidelines are separate documents, we must look to the documents themselves to determine how each may be changed. As detailed in the facts, the amendment process is different for the Covenants and the Design Guidelines. In order to alter the Covenants, there must be approval of 67 percent of the homeowners within The Gallery subdivision. However, changing the Design Guidelines requires only majority approval by the Executive Board of the Association. Clearly, the amendment process is easier for the Design Guidelines than for the Covenants. This relative ease with which the Design Guidelines may be altered falls within the intentions of the developers to be able to alter their development to accommodate changing market conditions and buyer desires.

In the case at bar, the amendment of the Design Guidelines was instituted after the commencement of the instant action by the appellant. A consent resolution was approved by Executive Board on June 4, 2008, revising the Design Guidelines to allow the construction of Peteler's smaller townhouses. Notice was given to all unit owners within The Gallery subdivision by letter dated July 16, 2008. The Executive Board met again on July 28, 2008, and despite hearing the complaints of many of the unit owners, ratified the August 4, 2008. This process comported with the stated requirements to amend the Design Guidelines. We therefore find no error in the circuit court's conclusion that the Design Guidelines were properly amended, albeit tardily, within the rules and regulations established in the Design Guidelines themselves.

### 3. Summary Judgment and Injunctive Relief

The appellant's request relief from the circuit court was the granting of a permanent injunction to stop the construction of the smaller townhouses within The Gallery Subdivision. While the lower court initially granted a temporary restraining order, it denied the appellant's request for a preliminary injunction and ultimately, the requested permanent injunction against Peteler's building efforts.

On the issue of whether to grant this injunction, we have held:

"The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ." Syllabus Point 4, *State ex rel. Donley v. Baker*, 112 W.Va. 263, 164 S.E. 154 (1932).

In addition:

"Unless an absolute right to injunctive relief is conferred by statute, the power to grant or refuse to modify, continue, or dissolve a temporary or a permanent injunction, whether preventative or mandatory in character, ordinarily rests in the sound discretion of the trial court, according to the facts and the circumstances of the particular case; and its action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion." Syllabus Point 11, *Stuart v. Lake Washington Realty*, 141 W.Va. 627, 92 S.E.2d 891 (1956).

Once the circuit court determined that the Design Guidelines were to be separately construed from the Covenants, and that the amended Design Guidelines authorized the smaller townhouses, the appellant's claim for injunctive relief diminished. The appellant did not have the absolute right to the relief requested. The appellant could also not counter the appellee's witness regarding the alleged diminution of the value of the appellant's home as a direct and proximate result of the building of the smaller townhouses. Instead, the appellee's witness opined that the building of these townhouses might act to increase the value of properties within The Gallery subdivision. We conclude that the circuit court properly exercised its discretion in denying the injunction to stop the building of Peteler's townhouses and will not disturb that finding upon appeal.

**131**

 The appellant also sought damages from the appellees for violations of these covenants. The circuit court addressed these claims by granting summary judgment in favor of the appellees. We have held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. Of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Further, "[t]he question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Syllabus Point 5, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. Of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

Having resolved that the Covenants and Design Guidelines are separate and distinct documents, and further, having affirmed the circuit court's rulings on whether Orchard could alter the terms of the Design Guidelines to allow for the construction of these smaller townhouses, we see no genuine issue of fact left to be tried. The circuit court correctly denied the appellant's requested injunction, and we affirm the lower court's ruling.

### IV.

### CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Berkeley County, West Virginia, entered September 30, 2008, denying injunctive relief to the appellant and granting summary judgment in favor of the appellees, is affirmed.

**Affirmed.**

Justice KETCHUM concurs and reserves the right to file a concurring opinion.

KETCHUM, J., concurring:

I agree with our decision which is based on the single issue argued in this case, i.e., whether the covenants and design guidelines adopted and published by the developer allowed the developer to later unilaterally reduce the size of the residences to be built in the subdivision.

I am writing to point out that our decision does not extinguish causes of actions by a purchaser to enforce sales brochures or similar materials. The law has long recognized that purchasers will ordinarily rely on sales and promotional materials rather than attempt to interpret the legalese in complicated development covenants and design guidelines. Promissory estoppel, fraudulent misrepresentation, and other causes of action based on sales brochures and similar material are still viable.