**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-2089**

_____

SNOWSHOE MOUNTAIN, INC., a West Virginia Corporation,

        Plaintiff – Appellee,

v.

RUBY DOG HOLDINGS, LLC, a foreign limited liability company; RUBY DOG, LP; KLB REAL ESTATE LLC,

        Defendants – Appellants.

_____

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins. Thomas S. Kleeh, District Judge. (2:22-cv-00018-TSK)

_____

Argued:  March 19, 2025                                    Decided:  May 27, 2025

_____

Before QUATTLEBAUM and HEYTENS, Circuit Judges, and TRAXLER, Senior Circuit Judge.

_____

Affirmed by unpublished opinion. Judge Heytens wrote the opinion, which Judge Quattlebaum joined. Judge Traxler wrote a dissenting opinion.

_____

**ARGUED:** Robert Lawrence Massie, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Huntington, West Virginia, for Appellants. Seth Patrick Hayes, JACKSON KELLY PLLC, Morgantown, West Virginia, for Appellee. **ON BRIEF:** Marc E. Williams, Jonah D. Samples, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Huntington, West Virginia, for Appellants. Ellen C. Cappellanti, JACKSON KELLY PLLC, Charleston, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

TOBY HEYTENS, Circuit Judge:

When an author says something in one place but omits it in a second, the obvious inference is that the author meant to leave that thing out in the second place. That inference grows even stronger if the author says the relevant thing in multiple places while leaving it out in just one. Applying those straightforward interpretative principles here, we affirm the district court's grant of judgment on the pleadings.

I.

This case is about who gets to use a West Virginia ski resort and under what terms. Snowshoe Mountain, Inc. (Snowshoe II) owns and operates the ski slopes at Snowshoe Mountain. Snowshoe II also leases and manages several businesses in the area, including some offering lodging. Appellant Ruby Dog Holdings, LLC owns a hotel near the mountain.

For many years, Snowshoe II allowed Ruby Dog's guests to use the ski slopes and related facilities under the same terms as guests staying at Snowshoe II-managed properties. In October 2022, however, Ruby Dog learned that Snowshoe II had adopted a policy that "guaranteed a ticket" and "the lowest lift ticket rate" only to "[g]uests that lodge through Snowshoe." JA 86.

Displeased by this development, Ruby Dog identified a provision in its chain of title which it believed required Snowshoe II to "extend its Preferred Ticket Program to" Ruby Dog, two affiliated companies, "and their guests." Ruby Dog Br. 5. Ruby Dog sent Snowshoe II a cease-and-desist letter. In response, Snowshoe II sued Ruby Dog in West Virginia state court, seeking a declaration that its conduct did not violate the relevant deed.

3

Ruby Dog removed the case to federal court. After filing an answer, affirmative defenses, and counterclaims, Ruby Dog added the two affiliated companies as counterclaim plaintiffs. The district court granted Snowshoe II judgment on the pleadings. We review that decision de novo. See *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).

II.

The parties agree that West Virginia law governs, and we decide the case on that understanding. Although the ultimate goal of deed interpretation is to give "effect to the intention of the parties," West Virginia's highest court has been clear that the language of the "written instrument" is the best evidence of that intent. *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 745 S.E.2d 461, 463 (W. Va. 2013) (*Faith United*) (quotation marks removed). For that reason, courts should "generally consider only" a deed's text to determine its meaning unless that text is "susceptible to differing or doubtful meanings." *Collingwood Appalachian Mins. III, LLC v. Erlewine*, 889 S.E.2d 697, 705 (W. Va. 2023). The text should be construed "as a whole, taking and considering all the parts together." *Faith United,* 745 S.E.2d at 463 (quotation marks removed). As when interpreting a contract, a deed's text also "should be so construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious." *Antero Res. Corp. v. Directional One Servs. Inc. USA*, 873 S.E.2d 832, 834 (W. Va. 2022) (quotation marks removed); see *Faith United*, 745 S.E.2d at 463 ("Deeds are subject to the principles of interpretation and construction that govern contracts generally."). "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written

4

[deed] or to make a new or different [deed] for them." *Antero Res. Corp.*, 873 S.E.2d at 834 (quotation marks removed).

The provision on which Ruby Dog hangs its hat is not contained in any agreement between it and Snowshoe II. Instead, the language appears in a 1979 deed executed by two of their predecessors in title—Snowshoe Company (Snowshoe I) and a general partnership called ABAS.[*] In the 1979 deed, Snowshoe I transferred certain real property to ABAS, while also making a series of promises and reserving other rights. Some of the land that Snowshoe I conveyed to ABAS was eventually transferred to Ruby Dog, and some of the land that Snowshoe I retained for itself eventually made its way to Snowshoe II.

Ruby Dog's argument rests almost entirely on one paragraph in the 1979 deed. That paragraph—which we will call the recreational facilities paragraph—reads:

> As a part of this conveyance, [Snowshoe I] covenants and agrees that all guests of any hotel or lodge constructed on the property hereby conveyed and all purchasers of residence units constructed on such property shall have, receive and be entitled to all such amenities and privileges, respecting the recreational facilities of the Snowshoe Resort, as are or may in the future be extended by [Snowshoe I] to other residents, invitees and guests of the Snowshoe Resort.

JA 37. In Ruby Dog's view, this paragraph binds Snowshoe II as the property's successive owner and forbids it from giving preferential treatment only to skiers staying at Snowshoe II-managed properties.

The problem with that argument is that it reads the recreational facilities paragraph as if it contains language that is present in other parts of the deed but absent there. Ruby

---

[*] Ruby Dog has not denied Snowshoe II's assertion that—despite the similarities in name—Snowshoe I and Snowshoe II are distinct legal entities.

5

Dog would have us interpret the recreational facilities paragraph's two references to Snowshoe I as meaning "Snowshoe I and any successors and assigns." Alternatively, Ruby Dog would have us interpret the paragraph as making promises that run with the land and thus bind any future owners of the burdened estate for that reason. But the deed says—over and over—that other provisions apply to Snowshoe I's "successors and assigns" without saying the same thing in the recreational facilities paragraph. The deed also identifies four "covenants and restrictions, which shall run with and bind the land," JA 38, but that list does not include a promise of recreational privileges and the recreational facilities paragraph contains no similar language. Interpreting the recreational facilities paragraph as binding Snowshoe I's successors and assigns or creating obligations that run with the land would thus render superfluous language in numerous other provisions. Such a reading would violate the maxim that courts should assume drafters act intentionally when they include language in some places but leave it out in others.

Ruby Dog responds by noting that the recreational facilities paragraph does not just confer benefits to ABAS, the original grantee. Instead, it says Snowshoe I "covenants and agrees that *all* guests of *any* hotel or lodge constructed on the property hereby conveyed and *all purchasers of residence units constructed on such property*" will have certain benefits. JA 37 (emphasis added). But saying that the benefits of an agreement (for example, a right to receive payment) can flow to others is different from saying that the burdens or obligations transfer too, and the recreational facilities paragraph makes just that distinction. Unlike other provisions in the deed (which refer to "Snowshoe Company" *and* "its successors and assigns"), the recreational facilities paragraph says the party making

6

the promise is "Snowshoe Company"—aka, Snowshoe I. JA 37–38. So although Ruby Dog might have been able to hold Snowshoe I to its promise in the deed, it cannot require the same of Snowshoe II.

Finally, Ruby Dog insists that the recreational facilities paragraph creates a covenant and that, under West Virginia law, there is a "presumption that all covenants run with the land" and thus bind subsequent owners. Ruby Dog Br. 21. But this is not a situation where the deed "as a whole" is silent about whether the promises it contains run with the land or bind later owners, and a court must decide how to interpret that silence. *Faith United,* 745 S.E.2d at 463 (quotation marks removed). Instead, the deed we construe here identifies *some* "covenants and restrictions, [that] shall run with and bind the land" and *some* promises that bind not just Snowshoe I but also "its successors and assigns," without saying anything similar in the provision Ruby Dog seeks to enforce. JA 37–38. Under West Virginia law, those differences in language should mean something. See *Bischoff v. Francesa,* 56 S.E.2d 865, 873 (W. Va. 1949) ("expressio unius est exclusio alterius"). We thus conclude that any applicable presumption has been rebutted by the deed's plain language. See, *e.g.*, *Roe v. M & R Pipeliners, Inc.*, 202 S.E.2d 816, 820 (W. Va. 1973) ("[E]videntiary presumptions must disappear in the face of sufficient evidence to the contrary."). And because we conclude the deed's language is unambiguous, we also decline to consider extrinsic evidence in interpreting it. See *Collingwood Appalachian Mins. III, LLC*, 889 S.E.2d at 705 ("When a deed is unambiguous, we generally consider only its text to determine the grantor's intent.").

\*    \*    \*

7

As with every case governed by state law, "it is possible" that West Virginia's "highest court would see matters differently than we" and the district court have. *Harriman v. Associated Indus. Ins. Co.*, 91 F.4th 724, 731 (4th Cir. 2024). But Ruby Dog "assumed that risk," *id.*, by removing a case originally filed in state court and never asking—even at this late date—to certify any questions to the Supreme Court of Appeals of West Virginia. The judgment is

*AFFIRMED*.

TRAXLER, Senior Judge, dissenting:

The district court held that the Recreational Covenant at issue in this case clearly and unambiguously created a personal rather than an appurtenant easement because the Covenant did not contain the same language used in other sections of the deed involving other easements. The district court, however, did not analyze the deed in the manner I believe is required by West Virginia law and did not apply the presumption favoring appurtenant easements. When the deed is considered as a whole and in light of all applicable interpretive rules, I believe a different result is required. Therefore, I respectfully dissent.

I.

Before I discuss the factual background of this case, I think it will be helpful to first sketch out the basic legal principles at issue here. Easements, covenants, and other devices that create rights and obligations connected to land may be generically referred to as "servitudes." *See Cottrell v. Nurnberger*, 47 S.E.2d 454, 457 (W. Va. 1948) ("The term easement and the term servitude are often used indiscriminately; the one is usually applied to the right enjoyed, the other to the burden imposed. A right of way over the land of another is an easement in the dominant estate and a servitude upon the servient estate."); *Restatement (Third) of Property (Servitudes)* § 1.1(1) (2000) ("A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land."). Servitudes are classified as either "appurtenant" or "personal." Appurtenant servitudes run with the land, which means they can be enforced by and against subsequent owners, while personal servitudes (also referred to as "in gross" servitudes) bind only the parties and cannot be

9

enforced by or against subsequent property owners. *See Newman v. Michel*, 688 S.E.2d 610, 617 (W. Va. 2009) (explaining that the benefits of an appurtenant easement "inhere to and pass with the transfer of the title to the dominant estate," while "[a]n easement in gross is not assignable and applies to specific people and not to guests or assignees").

## II.

Snowshoe Company ("Snowshoe Developer"), the predecessor-in-title of appellee Snowshoe Mountain, Inc. ("Snowshoe"), developed the Snowshoe ski resort in the late 1970s. In 1978-79, the company "began conveying parcels to third parties for purposes of constructing condominiums and other lodgings to further develop overnight accommodations at the resort." J.A. 345. Accordingly, in June 1979 Snowshoe Developer conveyed 3.69 acres of property within the footprint of the resort to ABAS Company, the predecessor-in-title to appellant Ruby Dog Holdings, LLC.

The deed granted to ABAS certain easements and rights-of-way over Snowshoe Developer's property, *see* J.A. 35-36; reserved to Snowshoe Developer certain easements over the property conveyed to ABAS, *see* J.A. 37; and imposed certain restrictions on the use of the ABAS property, including a requirement that the property could only be used to operate a small hotel or single-family residence units, *see* J.A. 38-39 ("No buildings or other structures shall be erected or maintained on the property, excepting only (i) a tourist hotel or lodge having no more than one hundred guest rooms, or (ii) a townhouse style single-family residence development or condominium containing no more than forty-five single-family residence units, or (iii) a garden apartment style single-family residence

10

development or condominium containing no more than sixty (60) single-family residence units."). The deed also included a clause (the "Recreational Covenant"), which provides:

> As a part of this conveyance, Snowshoe Company covenants and agrees that all guests of any hotel or lodge constructed on the property hereby conveyed and all purchasers of residence units constructed on such property shall have, receive and be entitled to all such amenities and privileges, respecting the recreational facilities of the Snowshoe Resort, as are or may in the future be extended by Snowshoe Company to other residents, invitees and guests of the Snowshoe Resort.

J.A. 37. Unlike the Recreational Covenant, the other clauses in the deed granting and reserving other servitudes specify that those provisions run with the land or inure to the benefit of Snowshoe Developer's and ABAS's successors and assigns, language that is generally understood to create an appurtenant servitude.

Throughout the history of the Snowshoe resort, the resort owner has operated a rental management program that handles—for a fee—marketing, reservations, maintenance, and housekeeping for its own lodging units and for participating third-party-owned properties. All property owners within the resort have the option of participating in the rental management program. *See* J.A. 347 ("In exchange for an owner enrolling his or her lodging unit in the rental management program and offering the resort owner exclusivity for renting the particular unit, the resort owner would market the unit through its promotional materials, manage all payment arrangements, and handle all maintenance and housekeeping services for the enrolled units."). The resort owner also has consistently offered various promotions and benefits—including discounted lift tickets when bundled with lodging—that are available "only to those guests staying in units managed through the rental program." J.A. 348.

11

When Ruby Dog bought the ABAS property in 2013, it included a functioning hotel called the Vantage Inn. After the first winter, Ruby Dog closed the Vantage Inn, made substantial renovations, and reopened it in December 2014 as the Corduroy Inn. *See* J.A. 549. The Corduroy Inn participated in the resort's rental management program from 2014 through most of 2020. *See* J.A. 548-49. In 2020, Ruby Dog expanded its operation and built the Corduroy Lodge next to the Corduroy Inn. When the combined and renamed Corduroy Inn and Lodge opened in December 2020, Ruby Dog removed the (old) Corduroy Inn from the program. The (new) Corduroy Inn and Lodge never participated in the rental management program. *See* J.A. 549.

The Snowshoe resort has two main areas for skiing—Snowshoe Basin and Silver Creek. Guests staying in the resort can access Snowshoe Basin without having to leave the main resort area, while guests must drive out of the main resort area to get to Silver Creek. Snowshoe Basin is the more popular area, and the resort now limits the number of daily lift tickets for Snowshoe Basin. If Snowshoe Basin reaches capacity on any day, the resort will thereafter sell lift tickets that grant access to Silver Creek only. Beginning with the 2021-22 ski season, Snowshoe implemented a "Preferred Ticket Program," which gives guests in Snowshoe-managed units discounted lift tickets as well as a *guaranteed* lift ticket for access to both Snowshoe Basin and Silver Creek, even if Snowshoe Basin is at capacity. *See* J.A. 25, 67.

Ruby Dog learned about the Preferred Ticket Program in October 2022, through an email from Snowshoe to all property owners announcing that the program would be in effect for the 2022-23 ski season. *See* J.A. 67. Ruby Dog contacted Snowshoe to ask how

12

its guests would be able to participate in the Preferred Ticket program, which Ruby Dog believed was guaranteed by the Recreation Covenant. Snowshoe's response was that it deemed Ruby Dog's guests ineligible because the Preferred Ticket Program and lift-ticket guarantee "are only afforded to the guests of those owners that have their property being managed by us in our rental management program. If you choose to put your property under our rental program, we will afford you those same rights." J.A. 558.

After receiving a letter from Ruby Dog's attorney demanding equal treatment for Ruby Dog's guests, Snowshoe brought a declaratory judgment in state court seeking a declaration that the Recreation Covenant was personal to the parties to the 1979 deed and not appurtenant to the property conveyed. Ruby Dog removed the case to federal court and asserted counterclaims. Ruby Dog sought a declaration that the Recreation Covenant is appurtenant and binding on Snowshoe's present owners, an injunction requiring Snowshoe to give Ruby Dog's guests access to the Preferred Ticket program and guaranteed lift tickets, and money damages for Snowshoe's breach of its obligations under the deed. The counterclaim also seeks to turn the case into a class action to permit other individual property owners within the resort whose chain of title includes a deed with a similar recreational covenant to participate in the case.

Snowshoe filed a motion for judgment on the pleadings, and the parties engaged in discovery while that motion remained pending. After discovery was complete, Snowshoe filed a motion for summary judgment, to which Ruby Dog responded. Although the motion for summary judgment was fully briefed, the district court decided to address only Snowshoe's motion for judgment on the pleadings. The district court held that the parties'

13

intent was conclusively established by the deed's failure to include runs-with-the-land or successors-and-assigns language in the Recreational Covenant, since that language was used in other parts of the deed. The court explained,

> the usage of "successors and assigns" used later in the deed indicates the Recreational Covenant is a personal covenant. The 1979 deed includes "successors and assigns" in four places. "Successors and assigns" is not written in the Amenities and Privileges provision. Because it is absent from the provision at issue, it is conclusive that the provision included only be a personal covenant between Snowshoe Company and ABAS. Indeed, "[i]f a written instrument framed to declare the rights of parties omit a matter that was present to the minds of each, the fact that such matter was not put in writing is conclusive of the intention of the framers of the instrument to leave it out." *Harbert v. Cnty. Ct. of Harrison Cnty.*, 39 S.E.2d 177, 186 (W. Va. 1946) (internal citation and quotation omitted).
>
> Similarly, the inclusion of the phrase "shall run with and bind the land" in the subsequent paragraph to the Recreational Covenant supports the Court's finding. The 1979 deed includes the phrase "shall run with and bind the land" once in the deed, and none of the four covenants associated with that paragraph relate to the Amenities and Privileges provision at issue. "Successors and assigns," using "shall run with and bind the land" once in the 1979 deed is conclusive evidence that neither of the original parties intended for the Amenities and Privileges provision to run with the land. A contrary finding would be considered "alter[ing] the language of the deed and . . . enlarg[ing] the estate conveyed by the deed." *Faith United*, 745 S.E.2d at 483.

J.A. 757-58 (footnote omitted). Accordingly, the district court concluded that the Recreational Covenant was personal, not appurtenant, and that the Covenant therefore could not be enforced by Ruby Dog against Snowshoe.

### III.

On appeal, Ruby Dog contends that the district court erred by giving dispositive effect to the absence of the appurtenant-creating language in the Recreational Covenant. Ruby Dog notes that under West Virginia law, no particular words are required to create

14

an appurtenant covenant, and it contends that the district court failed to consider the purpose of the Recreational Covenant and failed to properly apply West Virginia's presumption favoring appurtenant easements over personal easements. I agree.

When determining whether a servitude is appurtenant or personal, "'[t]he fundamental rule . . . is that the intention of the parties governs. That intention is gathered from the entire instrument by which the restriction is created, *the surrounding circumstances and the objects which the covenant is designed to accomplish.'" Foster v. Orchard Dev. Co.,* 705 S.E.2d 816, 826 (W. Va. 2010) (quoting *Wallace v. St. Clair*, 127 S.E.2d 742, 751 (W. Va. 1962)) (emphasis added). Moreover, if the case involves an easement rather than some other form of servitude, then the inquiry must "begin[] by assuming that the benefit of the easement is appurtenant." *McElroy Coal Co. v. Dobbs*, 853 S.E.2d 620, 628 (W. Va. 2020). The district court in this case did not apply these principles of West Virginia law—the court did not consider the language actually used in the Recreational Covenant, gave no consideration to the nature and purpose of the Recreational Covenant, and did not acknowledge the possibility that West Virginia's presumption in favor of appurtenant easements should be applied. And when these principles are properly applied, I believe that reversal and a remand are required.

A.

I begin with the presumption. Like many other states, West Virginia as a matter of policy prefers appurtenant easements over personal easements. *See Newman*, 688 S.E.2d at 617 ("Many jurisdictions, including this Court, have shown a strong constructional

15

preference for finding easements to be appurtenant rather than in gross."). As the West

Virginia courts have explained, however, not all servitudes are presumptively appurtenant:

> [W]hen a court confronts an easement servitude, it begins by assuming that the benefit of the easement is appurtenant. By contrast, when a court confronts a right-of-first-refusal servitude, the court begins by assuming that the benefit is personal—*i.e.*, that it is not transferable and does not run with land.

*McElroy Coal Co.*, 853 S.E.2d at 628 (emphasis omitted). The question, then, is whether

the servitude at issue here should be viewed as an easement and thus subject to the

presumption.

An easement is "defined as the right one person has to use the lands of another for

a specific purpose and is a distinct estate from the ownership of the soil itself." *Newman* ,

688 S.E.2d at 615. "An easement creates a nonpossessory right to enter and use land in the

possession of another and obligates the possessor not to interfere with the uses authorized

by the easement." *Restatement (Third) of Property (Servitudes)* § 1.2(1).[1] "The land

benefitting from an easement is called the *dominant estate;* the land burdened by an

easement is called the *servient estate.*" *Newman*, 688 S.E.2d at 615-16.

The Recreational Covenant promises that guests of any hotel located on the ABAS

property and private owners of any residences constructed on the property have the same

---

[1]      Because this case falls within our diversity jurisdiction, our job is to apply West Virginia law as it is applied by West Virginia courts, or, if necessary, predict how the Supreme Court of West Virginia would answer any unsettled questions of law. *See, e.g.*, *Curran v. Axon Enter.,* 57 F.4th 190, 195 n.7 (4th Cir. 2023). In cases involving easements and related issues, West Virginia courts frequently look to the Restatement. *See, e.g., McElroy Coal Co. v. Dobbs*, 853 S.E.2d 620, 626-28 (W. Va. 2020); *Newman v. Michel*, 688 S.E.2d 610, 615 (W. Va. 2009).

"amenities and privileges, respecting the recreational facilities of the Snowshoe Resort, as are or may in the future be extended by Snowshoe Company to other residents, invitees and guests of the Snowshoe Resort." J.A. 37. The Covenant thus grants ABAS guests and residents the right to enter and use resort property under the same terms and conditions that the resort imposes on its own guests and residents. Under the Covenant, the property conveyed to ABAS is the dominant estate, as its guests and residence owners benefit from the right of entry, and the resort property retained by Snowshoe Developer and now owned by appellee Snowshoe is the servient estate, as it bears the burden of the promise and must grant entry to ABAS guests and residence owners.

Under these circumstances, it seems clear to me that the right-of-entry servitude created by the Recreational Covenant is an easement. *See Newman*, 688 S.E.2d at 615 n.3 (recognizing that "a right of entry for any purpose relating to the dominant estate" is one of the "primary recognized easements"). And because the Covenant creates an easement, West Virginia's presumption favoring appurtenant easements applies.

Snowshoe does not address whether the Recreational Covenant created an easement or some other form of servitude. Instead, Snowshoe insists that the presumption is not applicable because the language of the deed unambiguously demonstrates that the parties intended the Covenant to be personal, not appurtenant. *See* Brief of Appellee at 21 ("If it is clear and unambiguous that a covenant is not to run with the land, that clear intent trumps any presumption."); *see Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 745 S.E.2d 461, 481 (W. Va. 2013) ("When the language used is plain and unambiguous, courts are required to apply, not construe, the contract."). Mirroring the

17

district court's analysis, Snowshoe contends the deed is unambiguous because the Recreational Covenant does not use the same running-with-land/successors-and-assigns language used in the other portions of the deed.

I do not agree that the answer is that simple. If the deed had explicitly stated that the Recreational Covenant was personal and did not run with the land, that would have unambiguously created a personal servitude. The deed likewise would have unambiguously created a personal servitude if it had said that the Recreational Covenant was binding only on the parties to the deed, not their successors or assigns. In actuality, the deed was not that clear and did not explicitly address whether the Recreational Covenant was intended to be appurtenant, despite making clear that other servitudes created by the deed were intended to be appurtenant. Thus, what we are presented with here is *not* a clear statement of the parties' intent to create a personal easement, but an *inference* of intent that can be drawn from one aspect of the deed.

Indeed, the legal principle Snowshoe relies on to argue that the language of the deed is so clear that interpretation is not required—*expressio unius est exclusio alterius*—is an *interpretive rule* that is used as "an aid to construing an otherwise ambiguous [document]." *State v. Euman*, 558 S.E.2d 319, 324 (W. Va. 2001) (McGraw, C.J., concurring); *see Harbert v. County Ct.*, 39 S.E.2d 177, 186 (W. Va. 1946) (noting "the well recognized and long established *principle of interpretation* of written instruments that the express mention of one thing implies the exclusion of another") (emphasis added).

Because the deed does not state in plain and unambiguous language that a personal easement was intended, the deed lacks the clarity necessary for it to be enforced without

18

resort to traditional rules of contract and deed interpretation. Our job is therefore to interpret the deed so as to determine whether the Recreational Covenant created an appurtenant or personal easement. West Virginia law tells us that to determine whether the easement is appurtenant or personal, we must consider the entirety of the deed in light of the purpose and object of the Covenant. And most importantly, our inquiry must begin with the presumption that the easement is appurtenant.

## B.

When concluding that the Recreational Covenant created a personal servitude, the district court considered only the fact that the Covenant did not include the same appurtenant-creating language used in other portions of the deed. The court held that the omission of that language conclusively established the parties' intent to create a personal easement. I disagree.

Contrary to the district court, I do not believe it is proper to equate the omission of the appurtenant-creating *language* to the omission of appurtenance itself. If language stating that a servitude runs with the land or inures to the benefit of the grantee's heirs and assigns were *required* to create an appurtenant easement, the omission of this language in the Recreational Covenant would be fatal to Ruby Dog's claims. That language, however, is *not* required to create an appurtenant servitude under West Virginia law, and the mere absence of that language does not conclusively establish that a personal easement was intended:

> Under our ruling in *Jones [v. Island Creek Coal Co.*, 91 S.E. 391 (W. Va. 1917)], in the absence of a showing that the conveyance was a merely personal right, then the right created should be considered an easement

19

appurtenant. *There is in this case no showing that the parties intended that the right be a merely personal one. Such a conclusion under the authority cited is not justified by the failure of the parties to use [the words "their heirs and assigns"].*

*Mays v. Hogue*, 260 S.E.2d 291, 294 (W. Va. 1979) (cleaned up) (emphasis added). Because there are other paths to appurtenance, the absence of that language in the Recreational Covenant simply cannot be dispositive of the parties' intent.

I recognize, however, that there is a difference between not using appurtenant-creating language anywhere in a document and using appurtenant-creating language in some clauses but not in others. Accordingly, I acknowledge that it is relevant to our inquiry that the deed used clear appurtenant-creating language in other parts of the deed but not in the Recreational Covenant, and that the omission of that language does raise some question about whether the parties intended an appurtenant easement. *See Harbert*, 39 S.E.2d at 186. Nonetheless, the inference that may be drawn from the omission of the appurtenant-creating language in the Recreational Covenant is but a single data point—and a fairly weak one at that:

> [E]*xpressio unius* is not a rule of law, but merely an aid to construing an otherwise ambiguous statute. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47:23, at 315 (6th ed. 2000). And even in this limited capacity courts have frequently admonished that "the maxim is to be applied with great caution and is recognized as unreliable." *Director, Office of Workers' Compensation Programs v. Bethlehem Mines Corp.,* 669 F.2d 187, 197 (4th Cir. 1982). The feebleness of the rule stems from the very nature of the inference that underlies it. As one commentator stated, the *expressio unius* maxim "is a questionable one in light of the dubious reliability of inferring specific intent from silence." Cass R. Sunstein, *Law and Administration after Chevron,* 90 Colum. L .Rev. 2071, 2109 n.182 (1990); *see also* Max Radin, *Statutory Interpretation,* 43 Harv. L. Rev. 863, 873–74 (1930) (calling the canon "one of the most fatuously simple of logical fallacies, the 'illicit major,' long the *pons asinorum* of schoolboys"). Thus, as the Seventh Circuit

20

> Court of Appeals succinctly observed, "not every silence is pregnant; *expressio unius est exclusio alterius* is therefore an uncertain guide to interpreting statutes." *Illinois Dep't of Public Aid v. Schweiker,* 707 F.2d 273, 277 (7th Cir.1983)

*Euman*, 558 S.E.2d at 324 (McGraw, C.J., concurring); *State Rd. Comm'n v. Kanawha Cnty. Ct.*, 163 S.E. 815, 817 (W. Va. 1932) ("This implication is based on the familiar maxim *expressio unius est exclusio alterius*. . . . [G]reat caution is necessary in dealing with the maxim, for it is not of universal application.") (cleaned up).

The district court effectively treated the *expressio unius* maxim as a rule of law by giving dispositive effect to the inference it creates, without consideration of any other inferences that may be drawn from the language and structure of the deed. However, the presumption favoring appurtenant easements does not drop away simply because one inference supporting a personal easement may be drawn from one aspect of the deed. Instead, the presumption is rebutted only by language that affirmatively demonstrates the intent to create a personal easement. *See Stricklin v. Meadows*, 544 S.E.2d 87, 92 (W. Va. 2001) ("In the absence of language in the deed creating a personal easement . . . , the easement is to be characterized as an easement appurtenant."); *Mays*, 260 S.E.2d at 294 ("[I]n the absence of a showing that the conveyance was a merely personal right, then the right created should be considered an easement appurtenant."). Because there is no language in the deed affirmatively demonstrating the parties' intent to create a personal easement, I believe West Virginia law requires us to treat the Recreational Covenant as an appurtenant easement.

21

Moreover, even beyond the absence of affirmative evidence of a personal easement, I believe that the language of the deed, viewed as a whole, shows that an appurtenant easement was intended. First, an inference that an appurtenant easement was intended may be drawn from the fact that the Recreational Covenant was included in the deed, rather than set out as a separate agreement between Snowshoe Developer and ABAS. *See Foster*, 705 S.E.2d at 826 (rejecting the argument that a planned community's design guidelines were part of the planned community's declaration of binding covenants in part because the design guidelines were set out in a separate document).

Second, the rights under the Covenant are extended to "all guests of *any hotel or lodge* constructed on the property," J.A. 37 (emphasis added), rather than being limited to guests of a hotel or lodge built by ABAS. Because an easement intended to be personal would typically name the specific person or entity to which the right is extended, the failure to limit the rights set out in the Recreational Covenant to ABAS suggests an appurtenant rather than a personal grant of rights. *See Newman*, 688 S.E.2d at 618 ("This agreement, which names T.M. Newman personally, is directly in line with the definition of an easement in gross which does not belong to any person by virtue of ownership of estate in other land but is mere personal interest in or right to use land of another . . . .") (cleaned up). Moreover, as previously discussed, the deed restricts the property to use as a small lodging facility (hotel or condominiums), and that restriction runs with the land. Because the hotels and condominiums promised access in the Recreational Covenant are the same hotels and condominiums required by the expressly appurtenant restriction, it is reasonable to conclude that the promised access was likewise intended to be appurtenant.

22

Third, the Covenant expressly extends the same rights to "all purchasers of residence units constructed on [the ABAS] property." J.A. 37. If the parties intended the Covenant to be personal to ABAS, this part of the Covenant would have no meaning, because ABAS's personal rights under the Covenant could not be conveyed by ABAS to any purchaser. *See Newman*, 688 S.E.2d at 617 ("An easement in gross is not assignable and applies to specific people and not to guests or assignees."). Interpreting the easement as personal thus renders a significant part of Snowshoe's promise illusory, which suggests that it is the wrong interpretation. *See, e.g.*, *Gabbert v. Coyne*, 888 S.E.2d 878, 885–86 (W. Va. 2023) ("If possible, effect should be given to all the language of a [contract], with no part being treated as meaningless, a nullity, or surplusage.") (cleaned up); *Syl. Pt. 4*, *Beverlin v. Casto*, 57 S.E. 411, 412 (W. Va. 1907) ("[A] deed will not be so construed as to render it a nullity as to any of the parties thereto, if, by any reasonable construction, such result can be avoided.").

Contrary to Snowshoe's argument, reading the Recreational Covenant to create an appurtenant easement despite the absence of appurtenant-creating language does not render that language meaningless where it was used. The other provisions in the deed deal primarily with the standard, infrastructure-related easements needed for real estate development projects—things like public access roads, utilities, etc. The language used in those provisions makes it absolutely clear that those easements were appurtenant, without requiring a court to apply interpretive rules to ascertain the parties' intent. Accordingly, that language has meaning in those provisions, without regard to our construction of the Recreational Covenant. The fact that the drafter of the deed chose not to use the same

23

language in the Recreational Covenant may raise a question about the intended nature of the Recreational Covenant, but it does not render the language meaningless in the places that it was used.[2]

As discussed above, the failure to use the clear appurtenant-creating language in the Recreational Covenant could be an indication that a personal easement was intended. But I believe it is inconsistent with the presumption favoring appurtenant easements to conclude that that single inference is sufficient to rebut the presumption where application of other interpretive principles yield the opposite inference. While the inference arising from the omission of the appurtenant-creating language may raise doubt about the intention of the parties, West Virginia law requires us to resolve doubt in favor of appurtenance. *See Wallace*, 127 S.E.2d at 751 (explaining that interpretive presumptions fall away "when there is no room for doubt as to the intention of the parties.") (cleaned up).

C.

Moreover, when we consider the purpose of the Recreational Covenant, I think it is apparent that the parties intended an appurtenant easement. *See id.* (explaining that the intention of the parties "is gathered from the entire instrument by which the restriction is

---

[2]    Snowshoe seems to find it particularly noteworthy that in the paragraph immediately following the Recreational Covenant, the deed lists four covenants and restrictions that are explicitly stated to "run with and bind the land," J.A. 38, but the Recreational Covenant is not included in that list. That paragraph, however, involves covenants and restrictions that Snowshoe Developer *was reserving for itself, see id.*, while the Recreational Covenant is a grant *from Snowshoe in favor of ABAS*. Given this fundamental difference, there is no reason the Recreational Covenant, whether appurtenant or personal, would have been included in that list.

created, the surrounding circumstances and *the objects which the covenant is designed to accomplish*") (emphasis added).

As discussed (and is apparent from the face of the deed), Snowshoe Developer sold property to ABAS and other third parties to further develop the resort's overnight accommodation business—the third parties would build hotels and condominiums so more people could stay overnight at the resort. The Recreational Covenant extended rights to the guests of the hotels and to the purchasers of residence units constructed on the properties. Treating the guests of these third-party hotels the same as Snowshoe guests and giving them the same access to resort amenities would encourage those thinking about staying overnight to stay on the resort rather than at off-resort rentals, which means more people would be spending more time and money at the resort.

If Snowshoe and the district court are right that the Recreational Covenant is personal rather than appurtenant, that means the promised equal treatment would extend to hotel guests only for as long as the hotel was owned by ABAS, and, as discussed above, would not be enforceable by any purchaser of any residential unit built on the property. *See Newman*, 688 S.E.2d at 617 ("An easement in gross is not assignable and applies to specific people and not to guests or assignees."). Such a result flies in the face of economic reality, and it is inconsistent with the purpose animating the entire transaction—if Ruby Dog's overnight guests are treated no better than and have no greater access than daily walk-in

25

skiers, there would be no incentive for would-be overnight skiers to choose on-resort lodging rather than cheaper lodging available outside the resort.[3]

Because the interest in maintaining a strong base of overnight guests would exist as long as the resort is in business, it would have made little sense for Snowshoe to limit the Recreational Covenant to the time that ABAS had an interest in the property; the economic interest exists and is furthered by the Covenant regardless of who owns the on-site hotel. There likewise would have been no reason for ABAS to seek a personal rather than an appurtenant easement. The terms of the Covenant make its planned lodging units more appealing and convenient to potential guests than off-resort overnight lodging options, thus adding value to any hotel as a going concern. If the Covenant were personal and thus could not be conveyed by ABAS, the hotel would be less valuable to third parties when ABAS decided to sell the property.

I therefore believe that when the language of the deed is considered in light of the purpose of the Recreational Covenant is considered, it supports my view that the Covenant must be understood to create an appurtenant easement.[4]

---

[3] The value to Ruby Dog of the Covenant's promise of equal access is even greater since the advent of the Preferred Ticket program, which limits access to the preferred Snowshoe Basin slopes once capacity is reached. Ruby Dog's property is located in the main part of the resort, steps away from one of the Basin chairlifts. But if Ruby Dog's guests cannot participate in the Preferred Ticket program, they do not have guaranteed access to the ski slopes right outside their front door. They would instead have guaranteed access only to the Silver Creek slopes, which requires driving out of the main resort area for access.

[4] Snowshoe also contends that, regardless of the parties' intent, the Recreational Covenant does not satisfy the traditional requirements that an appurtenant easement must touch or concern the land conveyed and that there be privity of estate. Snowshoe argues that because Ruby Dog does not own the land burdened by the

IV.

For the reasons set out above, I believe that when the language of the deed is considered as a whole and in light of the purpose of the Recreational Covenant, the Covenant must be understood to create an appurtenant easement that is binding on and enforceable by Snowshoe and Ruby Dog, the successors-in-title to the original parties to the deed. Accordingly, I believe the district court erred by concluding that the deed unambiguously shows that the parties intended the Recreational Covenant to be personal, not appurtenant, and by granting judgment on the pleadings in favor of Snowshoe.

Like a motion to dismiss under Rule 12(b)(6), a Rule 12(c) motion for judgment on the pleadings tests the legal sufficiency of the claims made in the pleadings. Although my opinion mentions some facts that were not included in the initial pleadings, information in the public record—such as the details about the precise location of the Corduroy Inn and

---

Recreational Covenant, the Covenant does not touch or concern Ruby Dog's property and privity is lacking. *See* Brief of Appellee at 23-27. These arguments reflect a fundamental misunderstanding of what easements are and how they operate. An easement is by definition a right to use *someone else's* land. *See Newman*, 688 S.E.2d at 615 (an easement is "defined as the right one person has to use the lands of another for a specific purpose and is a distinct estate from the ownership of the soil itself"); *Restatement (Third) of Property (Servitudes)* § 1.2(1) ("An easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement."). While Snowshoe is correct that the *burden* of the Covenant falls on it (because it is the owner of the servient estate), the *benefit* of the Covenant touches and concerns the ABAS property by giving its guests full use of the adjoining resort property. The fact that the burden of the easement falls solely on Snowshoe's side does not prevent the easement from being appurtenant; it is a *necessary feature* of an appurtenant easement. *See Cottrell*, 47 S.E.2d at 457 ("It is essential to the existence of an easement, which is appurtenant to land, that there be two distinct estates or tenements, the dominant to which the right belongs, and *the servient upon which the obligation rests*. . . . An affirmative easement exists when *the owner of the servient estate must permit something to be done upon it or some use to be made of it*.") (emphasis added).

27

Lodge—may be considered when evaluating a Rule 12(c) motion. *See Massey v. Ojaniit*, 759 F.3d 343, 352–53 (4th Cir. 2014) (explaining that when considering a Rule 12(c) motion, "courts may consider relevant facts obtained from the public record, so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint"). Other background information gleaned from the summary judgment record, such as emails between the parties discussing the Preferred Ticket program and details about the resort's rental management program, is included to provide a fuller factual context for the dispute, but that information is not critical to my view of the proper disposition of this case. What is relevant at this stage of the proceedings is the deed and the inferences that can be drawn from a consideration of the language used in light of the purpose behind the inclusion of the Recreational Covenant. The purpose of the Covenant—to increase resort revenues by providing more overnight accommodations within the resort—is apparent from the face of the deed, which only permits lodging units to be built on the property. The inconsistency of a personal easement with the language and purpose of the Covenant is likewise something this court can determine by considering only the terms of the deed.

For the reasons explained above, I believe the Recreational Covenant created an appurtenant easement. I would therefore vacate the district court's order and remand for further proceedings, including a determination of whether the Preferred Ticket program in fact breaches Snowshoe's obligations to Ruby Dog's guests under the Recreational

28

Covenant.[5] Accordingly, I respectfully dissent from the majority's decision affirming the judgment of the district court.

---

[5] In its complaint, Snowshoe avers that the Preferred Ticket program, which includes the lift ticket guarantee, is "offered equally across all lodging options located in Snowshoe Resort, including guests of the Corduroy Inn. For example, guests of the Corduroy Inn who reserve their room through Snowshoe receive the Lift Ticket Guaranty, and guests of the Corduroy Inn who reserve their room through some other booking platform, such as Expedia.com or VRBO, are not offered the Lift Ticket Guaranty." J.A. 31. However, the previously discussed emails from Snowshoe to Ruby Dog indicate that Ruby Dog would first have to rejoin Snowshoe's rental management program before its guests would be eligible for the deals. *See* J.A. 558 ("The lift ticket guarantees are only afforded to the guests of those owners that have their property being managed by us in our rental management program. If you choose to put your property under our rental program, we will afford you those same rights."). If Ruby Dog guests in fact can presently book a stay at the Corduroy Inn through Snowshoe's website and receive the benefit of the preferred ticket program, then it may well be that the program does not breach Ruby Dog's rights under the Recreational Covenant. However, if Ruby Dog must rejoin the rental management program and pay the associated fees before its guests can receive the benefit of the preferred ticket program, I believe that would more likely be a breach of the Covenant.